497 A.2d 485

Henry A. ROSENBERG, Jr.

v.

Eleanor K. ROSENBERG.

No. 1555, Sept. Term, 1984.

Court of Special Appeals of Maryland.

Sept. 10, 1985.

488

490

492

James G. Beach, Jr., Towson (Timothy J. Martin, Towson, and Walter J. Rockler, Washington, D.C., on brief), for appellant.

Arnold M. Weiner, Baltimore (Stephen B. Caplis, Donna C. Sanger and Phyllis W. Brown, Baltimore, on brief), for appellee.

Before WILNER, ROSALYN B. BELL and ROBERT M. BELL, JJ.

ROSALYN B. BELL, Judge.

Large fortunes beget large problems, which engender predictable issues when the holders of those fortunes enter the domestic relations arena. The issues referred to are labeled monetary award, alimony, custody/child support, counsel fees and costs. Only one of those issues is absent here, and that solely because of the age of the children.

Eleanor Kantor and Henry A. Rosenberg, Jr., were married on June 22, 1952, in Charleston, West Virginia. Their three sons are all emancipated. On November 1, 1981, Mr. Rosenberg left home with the purpose of ending the marriage. The divorce decree followed a lengthy and highly publicized trial and ended almost thirty-two years of marriage. The chancellor found, in part, that Mr. Rosenberg was

"guilty of adultery on numerous occasions during their marriage and that [Mrs. Rosenberg] committed adultery on a single occasion in 1983, approximately two years after the parties separated. There is clearly no hope of reconciliation between the parties. In short, without even considering disputed grounds for a divorce a vinculo matrimonii, all the bases for a divorce a vinculo matrimonii on the basis of adultery or on the basis of a two year separation have been met."

Before going into the details of the Rosenbergs' life together, it is important to look briefly at the family which is the source of this fortune.

### Rosenberg Family Background

Louis and Henrietta Blaustein were survived by one son and two daughters: Jacob, Fanny and Ruth. Jacob and his wife Hilda Blaustein had three children. Fanny married Alvin Thalheimer and they had one son. Ruth married Henry A. Rosenberg, Sr., and they had three children. Henry A. Rosenberg, Jr., appellant, was one of those children.

The American Trading and Production Corporation (ATAPCO) was started in 1931 by Louis and Jacob Blaustein. Louis Blaustein owned approximately 75% of the company's stock and Jacob Blaustein owned the remainder. Upon Louis Blaustein's death, most of his shares were transferred to his wife and three children.

ATAPCO originally consisted of a little less than fifty percent interest in Crown Central Petroleum Corporation (Crown) and twenty-five percent in American Oil Company. A subsequent merger of American Oil Company with Standard Oil of Indiana produced the large stock holdings of the latter company now held by ATAPCO. Most of the other family interests did not become a part of ATAPCO until much later. By the time the present case arose, ATAPCO had substantial gas interests, held interests in office and

commercial buildings, and had substantial manufacturing interests.

Following the death of Jacob Blaustein in 1970, many changes were made in the operation. Dr. Morton Blaustein, Jacob Blaustein's son, assumed greater responsibility, and David Hirschhorn, son-in-law of Jacob Blaustein, became President in 1980. Louis Thalheimer, grandson of Fanny Thalheimer, joined the business at about that time and was involved primarily in the marine operations.

During these transitions, appellant was the Chairman of the Board and Chief Executive Officer of Crown. ATAPCO continued to hold approximately 50% of the Crown voting stock and ATAPCO stock was owned wholly by family members.[1]

### Mr. and Mrs. Rosenberg

In 1954, after a short stint in the service, appellant returned to work at Crown, where his father was President. In 1955, his father died suddenly. To assist Mrs. Ruth Rosenberg, appellant and his family moved into the large family home, where they remained for two and one-half years.

In 1955, appellant also became a director of Crown and Assistant to the President. His career continued to flourish. He held the position of Vice President for Administration in 1959, in 1966 was elected the top officer of Crown, with the title of President, and assumed his present title in 1975. Appellant was elected to the Board of Directors of ATAPCO in 1961, and for more than twenty years, served as the only representative of the Rosenberg branch. When Jacob Blaustein died in 1970, appellant succeeded him as the ATAPCO representative on the Union Trust Board; ATAPCO is the largest shareholder in Union Trust Bank. Over the years, ATAPCO formed subsidiaries for its increasing

---

1. In 1980, the ownership of ATAPCO stock was divided approximately as follows: 50% by the Jacob Blaustein Branch, 25% by the Ruth Rosenberg branch, and 25% by the Fanny Thalheimer branch.

holdings, and appellant became a director of all but one of them. In 1979, he served as one of four members of a special ATAPCO committee, known as the Long Range Planning Committee, which was organized for the purpose of modernizing the ATAPCO maritime fleet. In 1980, when ATAPCO created an Advisory Committee, appellant became one of its four members. The precise function of that committee was a point of controversy in this case; that is, whether it was to serve as a place to air family differences, as an Executive Committee of the Board, or something in between.

Crown and ATAPCO prospered through the years and appellant's income soared; his assets swelled, and he adopted and maintained an opulent lifestyle for himself, his wife and his family. In 1983, his cash income exceeded $850,000, and his total annual income including noncash benefits was far more. ATAPCO provided him with free legal, accounting and investment services estimated at more than $50,000 for one year, and Crown supplied a new Cadillac automobile biannually. Crown and family foundations provided him with substantial resources for charitable giving. At the time of the divorce, the chancellor found appellant's net worth was approximately $33 million.

Eleanor Rosenberg, appellee, shared her husband's aspirations and made significant contributions to his success. Throughout the years of their marriage, appellee maintained a close relationship with all of the family members, including her mother-in-law and those who held leadership roles at ATAPCO. In addition, she did whatever she could to help further appellant's success. For instance, in 1955, when the first two of the parties' children were infants, appellant asked appellee to give him "his freedom" to pursue his business career. The witnesses overwhelmingly agreed that she undertook virtually the entire burden of raising the children and of maintaining and managing the family household. Appellant admitted that the single-minded pursuit of his business career led him to neglect his wife and family; he absented himself from the home on week-

ends and was even late for his 25th wedding anniversary party, a particularly sore point. Witnesses told of leaving the party before appellant's midnight arrival and of appellee's humiliation and embarrassment.

During the marriage, appellee also entertained frequently for her husband's benefit. She routinely invited business associates and community leaders to their home for large parties and intimate dinners, and she served regularly as the hostess for Crown executives and their wives at community, social, charitable and political events. Appellee accompanied her husband to the meetings of the National Petroleum Refiners Association, an industry group of more than 1,000 members. When he was made Chairman of that organization, she headed the wives' group and performed her duties skillfully, diligently and graciously.

The parties owned and occupied a 20-room mansion, maintained by a staff of four, in an exclusive area of Baltimore. Appellant also purchased and furnished two other homes at a combined cost of approximately $550,000. They vacationed frequently in the Caribbean, Mexico, Maine, and the ski areas of Colorado. On vacations and casual outings, they traveled in the Crown corporate jet which was at appellant's disposal.

Appellant's largest asset, and that which experienced the greatest growth, was his ownership interest in ATAPCO. Between September 1953 and July 1972, Ruth Rosenberg and Henrietta Blaustein (appellant's mother and grandmother, respectively) had created a total of four trusts for the benefit of family members, including appellant. The trusts contained substantial amounts of ATAPCO stock. He also held a remainder interest in numerous trusts created by Louis Blaustein, subject to a life interest and power of appointment in Ruth Rosenberg.

Over the years, the relationship between appellant and appellee deteriorated. He found interests outside the home, as did she. A substantial difference, however, was that his

interests involved, at least in part, other women, while she became prominent in community and charitable enterprises.

In the late 1970's appellee began to abuse alcohol and prescription drugs. Appellant also abused alcohol, but did not suffer the same effects. The situation reached a climax in July 1981, when she admitted herself to Springwood Hospital for drug treatment. He visited his wife at the hospital to announce that he was leaving home and to secure her signature on a separation agreement. She refused and then underwent a brief psychotic episode. As a result, her hospitalization was prolonged by about a month and a half. After her discharge from the hospital, appellant remained in the marital home and continued his efforts to have her sign the separation agreement. He ultimately moved out on November 1, 1981.

### Trial Court Proceedings

In 1983, Mrs. Rosenberg filed a Bill of Complaint for Divorce A Vinculo Matrimonii, alleging adultery, abandonment and desertion as grounds for the divorce. Mr. Rosenberg filed an Answer and Cross-Bill of Complaint for Divorce A Vinculo Matrimonii, relying on a two-year separation of the parties as grounds for the divorce. The case came to trial in April 1984 and lasted approximately four weeks. The chancellor, in an opinion dated June 15, 1984, granted the parties a divorce a vinculo matrimonii and further ordered that

1. the wife be granted a monetary award in the amount of $1,750,000 to be paid as follows: $1,000,000 within sixty days of the date of the decree and the balance of $750,000 to be paid within one hundred twenty days from the date of the decree;

2. the husband pay to the wife alimony in the amount of $275,000 per year, at the rate of $22,916.66 per month beginning July 1, 1984, to cease upon her remarriage or the death of either party;

3. if the parties did not come to a buy out agreement concerning the marital residence located at 7709 Cross-

land Road and its contents within one hundred eighty days from the date of the decree, the house and all contents not included in an agreement between the parties to be sold at public auction;

4. the husband pay the wife's attorney's fees, within ninety days, in the amount of $430,390.53, but reserved its decision on the wife's other litigation expenses pending further hearing; and

5. the husband to pay the wife's court costs.

Mr. Rosenberg moved to revise the judgment, claiming that the court made multiple errors in determining and valuing the marital property, and in granting the monetary award, alimony and attorney's fees. The court, on July 13, 1984, issued a supplemental opinion in which it made additional findings that

1. the wife obtained her interest in the marital residence at 7709 Crossland Road and in the contents thereof through gifts over the years from the husband; and

2. the husband intended that the wife would be the sole owner of the jewelry he gave to her as gifts.

and then amended its prior order to provide that

1. in the absence of an agreement, the proceeds of the sale of the house and its contents be divided equally between the parties; and

2. the husband pay to the wife a monetary award in the following manner:

a) $1,000,000 within sixty days from the date of this decree;

b) $520,000 within one hundred twenty days from the date of this decree; and

c) if the house and its contents are sold at public auction and if the wife's share of the net proceeds is less than $230,000 the husband pay to her the difference between $230,000 and her share of the proceeds.

The day before the court issued its supplemental opinion, Mr. Rosenberg moved to stay the enforcement of the June 15th order for the payment of a monetary award, alimony

and attorney's fees. On August 6, 1984, the court issued an order addressing that motion and

1. stayed the payment of a monetary award upon the husband's filing a supersedeas bond;

2. denied the requests to stay the payment of alimony and counsel fees; and

3. ordered that the parties' marital home at 7709 Crossland not be sold until sixty days after the husband has made full payment of the monetary award.

Subsequent to that order, the court held a hearing on the wife's litigation expenses. On September 5, 1984, it issued an order requiring the husband to pay $224,579.95 to the wife's attorneys for those expenses. Mr. Rosenberg moved to stay the order for the payment of litigation expenses, which motion was denied.

Mr. Rosenberg appealed, raising what appears superficially to be just a few issues:

"1. Did the Court correctly determine the amount of the monetary award?

"2. Was the award of alimony in the amount of $275,000 per year, payable at the rate of $22,916.66 per month, excessive?

"3. Was the award of counsel fees in the amount of $430,390.53 excessive and wrongly charged to Appellant/Cross-Appellee?

"4. Was the award of litigation expenses in the amount of $224,579.95 payable unto Appellee/Cross-Appellant's attorneys excessive and wrongly charged to Appellant/Cross-Appellee?"

Within them, however, he raises a spate of additional issues under the general heading of monetary award.

Also dissatisfied, appellee cross-appealed designating two issues:

"1. Where a husband acquired interests in a family business through gifts and bequests, and where the value of those interests increased substantially over the course of the marriage, did the trial Judge err in holding that the

increases could only be marital property to the extent that the wife proved that they resulted directly from the husband's personal efforts?

"2. Where the wife proved that her husband had acquired interests in a family business through gifts and bequests, that the husband had operated a substantial part of the business pursuant to an agreement among family members to divide responsibilities and share the results of their common efforts, and that value of the husband's interest had increased substantially over the course of the marriage, as a result of those common efforts, did the trial Judge err in declining to hold that the increase was marital property?"

## MONETARY AWARD

*Loans and Cash Advances to Dorothy Bohny.*

The chancellor meticulously catalogued the assets of the parties, designated the marital property and then valued it. Items of marital property included: (1) an interest-free promissory note from Dorothy Bohny[2]; (2) the interest foregone on that note; and (3) the amount of various cash advances to Dorothy Bohny between June 2, 1982, and April 1, 1984. The chancellor found that these items dissipated the marital property and explained:

"[T]he circumstances surrounding the loan to Mrs. Bohny indicate that [appellant] went to great lengths to conceal the transaction. Had this loan been made in the normal course of business, interest would have been earned by the lender. [Appellant] conferred upon Mrs. Bohny the benefit of marital property monies, and by not charging interest on the loan, [appellant] gave to her money in which his wife had an interest. The $51,000. cash advances given to Mrs. Bohny also constitute dissipation of the marital estate. The Court accepts [appellee's] argument and, for the aforesaid reasons, has included in its

---

2. Apparently the new Mrs. Rosenberg.

determination of marital property the value of the interest which would have been earned on the note and the value of the cash advances made to Mrs. Bohny by [appellant]."

Appellant contends that the inclusion of the loan, interest and cash advances was error absent evidence that he intentionally dissipated the property. He argues, therefore, that the value of the marital property should be reduced by the amount of these items.

We will address the loan and the cash advances together and then discuss the interest.

-Loans and Cash Advances-

In *Sharp v. Sharp*, 58 Md.App. 386, 473 A.2d 499 (1984), this Court stated that

"[W]here a chancellor finds that property was intentionally dissipated in order to avoid inclusion of that property towards consideration of a monetary award, such intentional dissipation is no more than a fraud on marital rights ... and the chancellor should consider the dissipated property as extant marital property under § 3–6A–05(a) to be valued with the other existing marital property. This principle would apply even where the dissipated property cannot be recovered because it is in the hands of a purchaser who took in good faith, without notice and for value." (citations omitted).

*Id.* at 399, 473 A.2d 499.

We noted further that the inclusion of the dissipated property was consistent with the stated policy of adjusting the spouses' property interests fairly and equitably. *Id.*

The chancellor in the case *sub judice* found that appellant had dissipated the marital property by making the loan and cash advances to Dorothy Bohny. We conclude that the evidence supports this finding and will explain.

Appellant loaned $150,000 to Dorothy Bohny in 1981, after he informed appellee that he intended to end the marriage. The transaction did not occur directly between

appellant and Bohny. Rather, appellant transferred funds to a Texas bank account, the bank delivered them to a Texas attorney, and the attorney transmitted the amount to Bohny. The promissory note provided that Bohny would repay the amount to Camac, Inc., a straw corporation utilized by appellant. When asked about the loan on deposition, appellant denied any knowledge of it. The cash advances began in 1982 and continued into 1984, shortly before the trial began.

The court's findings are supported by the evidence. We hold the court was not clearly erroneous in including the loan and cash advances as marital property. Md.Rule 1086.

### -Interest-

■ The promissory note stated on its face that -0-% interest would be paid on the loan. The court included the interest foregone on the loan as marital property explaining that, if appellant had transferred the funds "in the normal course of business, interest would have been earned...." Thus, the lost interest was also a dissipation of the marital property.

Interest is defined as "compensation for the use or forbearance of money." *Rosen v. United States,* 288 F.2d 658, 660 (3d Cir.1961); *See Candiano v. Moore-McCormack Lines, Inc.,* 407 F.2d 385, 387 (2d Cir.1969). Although interest will not be allowed if there was an obvious intent not to charge interest, 47 C.J.S., *Interest & Usury,* § 13 at 44 (1982), "[a]n award of interest [may be] made so that a person wrongfully deprived of the use of his money should be made whole for his loss." *Laminoirs v. Southwire Co.,* 484 F.Supp. 1063, 1069 (N.D.Ga.1980).

Because the dissipation of marital property constitutes a fraud on marital rights, *Sharp, supra,* and the court noted that interest would have been accrued on an ordinary loan, appellee was wrongfully deprived of this gain on marital property. We, therefore, hold the court did not err in including interest on the loan as marital property.

We disagree with appellant that interest-free loans do not result in constructive income to the lender. This point has no significance, however, in a situation where one spouse attempts to reduce the marital property through loans or gifts of property—the interest-free portion merely increases the amount dissipated. Appellant does raise a point that warrants scrutiny. He contends that if he had received the interest, it would have been subject to Federal and State income taxes of more than 50%. The income tax consequences do not alter the value of the marital asset, but may merit attention. We will consider the effect of this factor hereafter when we address a similar issue raised by appellant concerning the value of his pension and retirement accounts, and forced sale of assets.

### Valuation of Pension and Retirement Accounts

The marital property identified and valued by the chancellor totalled $2,886,509.40. A substantial portion of that figure came from various pension savings and retirement plans provided for appellant by Crown:

| | |
|---|---|
| Employee Stock Ownership Plan | $13,712.00 |
| Savings Plan | 624,764.04 |
| Pension Trust Agreement | 169,800.00 |
| Retirement Plan | 767,943.00 |

Not surprisingly, appellant argues that these values are overstated. Before we consider appellant's various contentions, we need to look at the plans themselves.

Crown Central Petroleum Corporation maintains five retirement plans: (1) an employee savings plan; (2) an employee stock ownership plan (ESOP); (3) an employee pension trust; (4) a retirement income plan; and (5) a supplemental retirement income plan. Each plan is categorized as either a defined contribution plan or a defined benefit plan, and all but the Supplemental Retirement Income Plan qualify for favorable tax treatment under I.R.C., § 401 *et seq.* (1983).

The Crown Employees Savings Plan and the ESOP are defined contribution plans. They provide a separate ac-

count for each participant into which Crown makes specified annual contributions. Dunkle, *Guide to Pension and Profit Sharing Plans*, § 1.03 (1984); Fam.L.Tax Guide (CCH) ¶ 2502 (1985). Plan assets are invested, and the earnings and appreciation (or losses) on those assets are allocated to each account. *Id.* At retirement, the employee is entitled to an amount equal to the cumulative value of his share. *Id.*

The remaining plans—the Employees Pension Trust Agreement, the Retirement Income Plan and the Supplemental Retirement Income Plan are defined benefit plans. The benefits in these plans are specified in advance, usually as a percentage of salary, and correlated with years of service. Dunkle, *Guide to Pension and Profit Sharing Plans, supra;* Fam.L.Tax Guide (CCH) ¶ 2503, *supra.* A separate account is not maintained for each employee. *Id.* Rather, the employee's present interest in the plan is derived from the amount of the pension promised at retirement. Fam.L.Tax Guide (CCH), *supra.*

Under the four retirement plans which are "qualified plans" for tax purposes, I.R.C. § 401 *et seq., supra,* Crown is permitted to take income tax deductions for contributions, and interest may accumulate in the plans without being taxed. Dunkle, *Guide to Pension and Profit Sharing Plans, supra.* The benefits provided to employees through these plans, however, are subject to dollar limits. I.R.C., § 415, *supra.* In 1982, the Tax Equity and Fiscal Responsibility Act (TEFRA) further reduced the annual benefit payable to $90,000 under a qualified defined benefit plan, I.R.C. § 415(b)(1)(A), *supra,* and under a qualified defined contribution plan to $30,000, I.R.C. § 415(c)(1)(A), *supra.*[3] Finally, in applying these limits, "all defined benefit plans ... of an employer are to be treated as one defined benefit plan." I.R.C. § 415(f), *supra.*

---

3. Prior to the enactment of TEFRA, the limits were $136,425 for defined benefit plans and $45,475 for defined contribution plans. Dunkle, *Guide to Pension and Profit Sharing Plans* at § 1.05.

The court determined that four of the five retirement plans constitute marital property for purposes of making a monetary award pursuant to Md.Cts. & Jud.Proc. Code Ann., § 3–6A–05 (1974, 1984 Repl.Vol.)[4].

In finding that the fifth plan, the Supplemental Retirement Income Plan, was not marital property, it explained

"The Supplemental Retirement Income Plan covers senior executives designated as participants by the Board of Directors. [Appellant] will not become eligible for this Plan until October, 1984, at the earliest, and at that time his coverage must be approved by the Board. As [appellant] possessed no right to participate in this Plan during his marriage, the Court finds that the Plan in no way constitutes marital property, even though the Board's approval of [appellant's] inclusion in the Supplemental Plan is almost guaranteed."

Appellant maintains that the court made multiple errors in valuing the retirement plans. Specifically, he asserts that: (1) the date of valuation the court used was in error; (2) the Crown Retirement Income Plan was overvalued, because the court adopted a method of valuation which erroneously included projected post-divorce salary increases and which did not take into account the TEFRA limits and offset provisions; and (3) the Crown Savings Plan and the Employee Stock Ownership Plan (ESOP) were overvalued because the court (a) did not consider the deferred income taxes he would incur upon realization of plan benefits; and (b) did not consider restrictions on ESOP distributions and fluctuations in stock value during the time distribution is prohibited. He concluded that the "compound effect" of these errors resulted in an excess valuation of the marital property of over one million dollars.

We will address these allegations in turn.

---

**4.** Now Md.Fam.Law Code Ann., § 8–205(a) (1984).

-The Date of Valuation-

Appellant contends that the court erred in valuing the retirement and pension plans as of May 17, 1984, the date the trial ended, rather than on June 15, 1984, the date of the divorce decree. In support of his argument he cites this Court's holdings in *Cotter v. Cotter,* 58 Md.App. 529, 473 A.2d 970 (1984); *Gravenstine v. Gravenstine,* 58 Md.App. 158, 472 A.2d 1001 (1984); and *Dobbyn v. Dobbyn,* 57 Md.App. 662, 471 A.2d 1068 (1984).

In *Dobbyn,* we held that marital property is "to be valued as of the date of the decree of absolute divorce based upon evidence produced at trial." *Id.* at 676, 471 A.2d 1068. We further stated that the court may reserve in the decree an additional ninety days to determine value. *Id.* at 676–77, 471 A.2d 1068. Appellant interprets *Dobbyn* and its progeny to require that, in effect, the chancellor must make an independent valuation of the marital property subsequent to the trial.

That interpretation is highly impractical, as illustrated in the recent case of *Green v. Green,* 64 Md.App. 122, 494 A.2d 721 (1985). Judge Karwacki, writing for this Court, said:

> "Most applications of the Marital Property Act to the evidence presented at trial preclude an immediate decision by the court at the close of the evidence. We will not, nor should we, encourage hasty decision making in such cases. On the other hand, unreasonable delays between the close of the evidence and the rendering of the judgment may in some cases cause distortion in the valuation of certain highly volatile marital property, resulting in prejudice to one of the parties ... [W]e point out that equity requires that reasonable efforts be made to ensure that valuations of marital property approximate the date of a judgment of divorce which includes a monetary award."

*Id.* at 140–41, 494 A.2d 721.

In the present case, the court valued the marital property based upon the evidence produced at trial, and

only one month elapsed between the close of the testimony and the date of the decree. Under these circumstances, we hold there was no error.

■ Appellant further asserts that the court erred in valuing the Crown Savings Plan and the ESOP "as of May 11, 1984 ... by adopting the value shown in a Crown benefit statement of September 30, 1983." He neglects to mention, however, that the benefit statement to which he refers was issued by Crown annually and the September 30 statement represented the most recent one available. No objection was raised by appellant to this value at trial. No more recent valuation was offered by appellant. He has preserved nothing to complain about. We hold the court did not err in utilizing the September 30 valuation.

Moreover, at a hearing on June 4, 1984, counsel for appellee attempted to offer evidence of more recent values—specifically a change in value of Standard Oil of Indiana stock and evidence of a plan to buy back 10.3% of the stock. On objection of appellant, it was not admitted.

The real thrust of appellant's complaint on valuation is directed at the projections of appellee's actuary in valuing the Retirement Income Plan. This involves the method of valuation, not the date, and we will consider that next.

-The Retirement Income Plan-

Appellant asserts that the court erred in two ways in determining the present value of his benefits under the Crown Retirement Income Plan. First, he complains that the method of valuation erroneously included "a speculative assumption that the Husband's salary would increase at a compound rate of 9.5% per year until age 65." Second, he argues that the court failed to "apply properly the effect of TEFRA limitations and the offset provisions...."

1. Method of Valuation

■ It is well established that "trial courts are presented with a complex task in properly valuing and allocating retirment benefits between former spouses." *Deering v.*

*Deering,* 292 Md. 115, 129, 437 A.2d 883 (1981). Whether the chancellor's use of any particular method of valuation "represents an appropriate exercise of discretion depends, of necessity, upon the circumstances of the individual case." *Id.* at 131, 437 A.2d 883. *Barr v. Barr,* 58 Md.App. 569, 590, 473 A.2d 1300 (1984); *Harman v. Harman,* 61 Md. App. 554, 571, 487 A.2d 689 (1985).

In the case *sub judice,* both parties presented expert witnesses, each of whom calculated the present value of appellant's interest in the Retirement Income Plan. Appellant's actuary utilized assumptions for mortality, interest and retirement age. Appellee's actuary utilized these factors and further assumed that appellant's salary would increase at an average rate of 9.5% until his retirement. The latter assumption was derived from Crown's statement of appellant's salary history.

The court accepted appellee's proffered method of valuation. Before doing so, however, it discussed how Plan benefits are ascertained:

> "Benefits under the Crown Retirement Plan are determined by the application at retirement of pension credits earned each year to the highest average compensation earned by the employee for the thirty-six consecutive months prior to retirement. The Court's valuation of [appellant's] interest in the Retirement Plan at $767,943. takes into consideration only those credits earned by [appellant] between July 16, 1952, when he was first employed by Crown, and March 31, 1984. All credits earned after March 31, 1984, are determined to be non-marital property of [appellant]."

The chancellor then explained that appellee's valuation method

> "[U]tilizes actuarial assumptions of the Pension Benefit Guarantee Corporation mortality tables and interest rates and assumes [appellant's] retirement age at sixty-five. The Court accepts the testimony of Robert Bolton, actuary, that in order to determine the present value of the

credits earned by [appellant] to date under the Retirement Plan, these actuarial assumptions are necessary, as is a determination as to the thirty-six month highest average compensation against which presently earned credits will be applied. The Court accepts the statement of Mr. Bolton, who testified on [appellee's] behalf, that it would be a reasonable assumption that [appellant's] salary will increase at an average rate of 9.5 percent until his retirement, as the average annual rate of [appellant's] salary increase has been 12.8 percent since [appellant] became Chairman of the Board at Crown."

■ Appellant's benefits under the Retirement Income Plan will be derived from his highest average compensation for the three years prior to retirement. The court, therefore, utilized a valuation method which included an assumption that appellant's salary would increase annually at an average rate of 9.5% until retirement. We hold that the chancellor properly exercised his discretion in utilizing that approach.

### 2. TEFRA Limits

Appellant claims on appeal, as he did at trial, that the TEFRA limits and offset provisions must be applied in calculating the value of his present interest in the Income Retirement Plan. The Crown Income Retirement Plan does qualify for favorable tax treatment under I.R.C. § 401 *et seq., supra.* As a result, plan benefits are subject to certain dollar limits. I.R.C. § 415(b)(1)(A), *supra.* Additionally, this plan and the Pension Trust Agreement must be treated as one plan in applying those limits. I.R.C. § 415(f), *supra.* Nevertheless, the court found that

"[t]he Supplemental Retirement Income Plan, the value of which has already been determined to be non-marital property, was created to provide [appellant] and other senior executives at Crown with the benefits TEFRA would have denied. It would be incredible to this Court

for the [appellant], being a member of the family that controls Crown through its ownership of ATAPCO, to be denied by the Board of Crown membership in the Supplemental Retirement Income Plan when [appellant] reaches the age of fifty-five in October, 1984."

On that basis, it concluded that appellant's argument that the plan valuation be limited by TEFRA had "no merit."

The record shows that appellant has an agreement with Crown concerning the benefits he will be paid upon retirement. This is evidenced by the annual Personal Statement of Benefits he received from Crown eight months before trial which provided in pertinent part:

"Based on your current earnings and projected service, *should* you elect to retire on your normal retirement date at age 65, it is estimated that you will receive ... $17,454 a month from the Crown pension programs. $723 a month from Social Security. $18,177 estimated total monthly benefit." (emphasis supplied).

The statement indicates that based upon his current earnings, appellant will be entitled to receive $209,448 annually from the Crown Pension Programs, which include the Retirement Income Plan and the Pension Trust Agreement.

The benefit statement and the existence of a Supplemental Retirement Plan indicate a means through which the company can provide accrued benefits that exceed the limits imposed by the Internal Revenue Service. We hold, therefore, that the TEFRA limits and offset provisions are not relevant to a determination of the present value of appellant's pension benefits. Furthermore, we point out that appellee established that appellant's entitlement to retirement benefits exceeded the TEFRA limits. Appellant, on the other hand, failed to go forward and prove that his overall benefits would be limited by TEFRA. Thus, even assuming arguendo that these limits were relevant, appellant did not establish that Crown would not provide him the additional benefits.

-The Crown Savings Plan and the ESOP-

Appellant next contends that the court erred in its valuation of the Savings Plan and the ESOP, because it did not "give any effect to the deferred income taxes which would be incurred upon realization of the benefits . . . ."

Even if the court should consider income tax in making a monetary award, it should not be included in the valuation of marital property. Rather, income tax is considered as an "other factor." Md.Cts. & Jud.Proc.Code Ann., § 3–6A–05(b)(9), *supra*.[5] We will discuss this contention in greater detail when we reach the actual determination of the monetary award.

Appellant also argues that, in assessing the ESOP, the court failed to consider: (1) the restrictions on distributions; and (2) the possibility of fluctuations in value during the time distribution is prohibited. The Crown Employee Stock Ownership Plan is a defined contribution plan which qualifies for favorable tax treatment under I.R.C. § 409A, *supra*. It is designed to be used primarily for purchasing Crown stock, which is then held in trust for the benefit of participating employees. In a qualified ESOP, such as the one here, shares of stock allocated to each participant's account must remain in trust for eighty-four months before being distributed, unless the employee dies, is disabled or is terminated. I.R.C. § 409A(d), *supra*.

Neither of appellant's contentions concerning the ESOP need detain us long. First, retirement plans, by definition, involve restrictions in one form or another. Thus, the restrictions on stock distribution under the ESOP do not render this plan incapable of valuation as appellant implies. Furthermore, the probability of stock fluctuations while distribution is prohibited is speculative and not immediately ascertainable. The court, therefore, may ignore them in calculating the present value of the plan. *See In*

---

5. Now Md.Fam.Law Code Ann., § 8–205(a)(10).

*Re Marriage of Marx,* 97 Cal.App.3d 215, 159 Cal.Rptr. 215 (1979).

## Trust Interests—Non-Marital Assets
### -Remainder Interests-

In 1934, Louis Blaustein (appellant's grandfather) funded numerous separate trusts in which he gave appellant a remainder interest, subject to a life interest, and a testamentary power of appointment in Ruth B. Rosenberg. These trusts were not funded with ATAPCO stock. At trial, appellee's experts testified that the total present value of the remainder interest in these trusts was just over $4.2 million. The court classified them as non-marital assets, because they were acquired by gift; it also accepted the $4.2 million valuation.

### -Life Interests-

From 1953 through 1972, Ruth B. Rosenberg and Henrietta Blaustein (appellant's mother and grandmother, respectively) each created two trusts naming appellant as lifetime beneficiary and his descendants as remaindermen. All four trusts gave him a testamentary power to terminate the interest of any remainderman and to appoint any share, outright or in trust, to his descendants or certain other family members. Ruth Rosenberg created one trust in 1953 and the other in 1972. Henrietta Blaustein created a trust in 1953 and a second one in her will. She died in 1965.

In 1956, a stock dividend of three shares of newly authorized ATAPCO Class B Common stock was declared for each share of Class A Common stock. At the time of the divorce, the four trusts all contained Class A stock and the two 1953 trusts also included Class B stock. The chancellor valued the trusts at more than $26 million and appellant's life interests at $24 million. In his opinion, he found these four trusts to be non-marital property, since appellant acquired them directly by gift or inheritance. As will appear later, in more detail, appellee argued that the increase in value of these trusts should be considered marital property.

-Valuation of Trust Interests-

1. Remainder Interests

The chancellor found that the corpus of the Louis Blaustein trusts

"totaled $7,279,160 as of June 30, 1983. [Appellant's] remainder interests are subject to the rights of his mother to invade the principal during her lifetime and to exercise a testamentary power of appointment naming others remaindermen. [Appellee's] expert, Mr. Bolton, by employing standard assumptions as to Ruth B. Rosenberg's life interests and a 9.50 percent discount rate, concluded that [appellant's] remainder interests were valued at $4,258,633, or 58.5 percent of the value of the corpus. At trial, Mr. Bolton recalculated using the more recent discount rate of 9.75 percent established by the Pension Benefit Guarantee Corporation. Using this higher discount rate, [appellant's] remainder interests constituted 47.8 percent of the corpus, or $4,207,354."

The chancellor accepted appellee's expert's valuation and adopted the more recent figure provided as the value of the remainder interests.

Appellant contests the chancellor's finding, asserting it was premised on the assumption that the interest was fully vested and freely transferable and assignable. He further asserts that the chancellor failed to consider that he could be divested of his remainder interests under all but one of the trusts if his mother exercised her power of appointment. Appellee points out, appropriately, that appellant failed to preserve any of these objections to the valuation by specifying the same amount in his Proposed Findings of Fact. Appellant now attempts to recant that inclusion and argues that "in accordance with his duty to try to expedite the trial he agreed that these interests would have had that value *if* they were *not* spendthrift interests subject to powers of appointment and withdrawal." (emphasis supplied).

We view appellant's position as implausible. At the time he made what he now claims was a concession, there had

been no decision by the chancellor on the effect of the provisions. Furthermore, appellant made no corresponding effort "to expedite the trial" by conceding the values on those life interest trusts, which also carried spendthrift provisions. Additionally, he produced no evidence of an alternative valuation, but merely disagreed. The issue was not preserved for appeal. Md.Rules 1085 and 1086.

## 2. Life Interests

The chancellor found that when the trusts were created, the value of the shares held for appellant's benefit totaled $674,400.[6] By December, 1983, the value of the corpus had increased to at least $26,065,841, of which appellant's interest was $24,412,212.

Appellant contends the chancellor erred in making this determination in that (1) he simply accepted the testimony of appellee's witnesses on the valuation, and (2) he failed to recognize the controlling effect of the spendthrift provisions.[7]

Appellant raises several specific complaints regarding the testimony of appellee's actuary: the actuary ignored the actual income of the trusts; he improperly used an assumed yield; and he acknowledged that another method of valuing the life interests would result in the right to receive divi-

---

**6.** The Henrietta Blaustein testamentary trust also included non-ATAP-CO stock, the value of which is not an issue on appeal.

**7.** He also complains about the acceptance by the chancellor of the valuation of the ATAPCO stock which formed the corpus of three trusts as well as a major portion of the fourth; he failed, however, to specify the basis for the complaint. Appellant attempted to incorporate by reference 10 pages of his Memorandum in Support of Defendant's Motion to Revise Opinion and Order wherein he specified errors made by one of appellee's expert witnesses in valuing ATAPCO stock.

Only by special permission of this Court may a brief exceed 35 pages. Md.Rule 1031(b). In accordance with this rule, appellant received permission to include 40 pages in his brief, which he did. We will not permit circumvention of these rules by subterfuge. Since the claim of error is not specifically set forth in the brief, we decline to address it.

dends having a total value of more than the corpus. In addition, appellant complained that another witness proposed a weighted average using alternative valuations, producing the value of $24,214,747 for the life interest.

The chancellor issued a detailed and specific opinion concerning this valuation:

"Mr. Gill's calculation of the value of [appellant's] trust holdings in ATAPCO included a discount of thirty-five percent, taking into consideration the customary rate for their status as a minority share in a closely held corporation. Mr. Friedman, on the other hand, felt the Class A shares should be discounted by forty-four percent and the Class B shares by forty-six percent, basing these percentages on prospective sales to outsiders. The Court accepts Mr. Gill's valuation of [appellant's] life interests in the trusts. Mr. Gill used two methods for calculating [appellant's] life interests: First, he used actuarial methods and assumptions for dividing value between life and remainder interests, and the second method he used was based on determining the present value of the income which would be derived from the trusts during [appellant's] lifetime.

"Mr. Robert Bolton provided the actuarial assumptions for the first method. Mr. Bolton found that [appellant's] life expectancy is 23.786 years and that a discount rate of 9.5 percent would be reasonable. The resulting conclusion from the use of these figures is that [appellant's] life interests were approximately 80.6 percent of the total value of the trusts, or $21,009,068.

"The second method used the same life expectancy and discount rate as the first and considered ATAPCO's history of an increase in dividends at the rate of twenty percent per year. This method, assuming the same rate of dividend growth, determines the present value of the income to be derived by [appellant] to be $33,831,786.

"Mr. Gill weighed these figures, having concluded that the second method was somewhat less precise than the first because it required a projection of future dividend

income. He gave the first method three times more weight than the second, less precise, method, concluding that the value of [appellant's] life interests is $24,214,747. The Court accepts his conclusion and finds that this figure was derived through fair and reasonable methods."

■ Appellant's fundamental complaint is that the chancellor was not persuaded by his experts. That does not constitute error. *Barr v. Barr*, 58 Md.App. at 589, 473 A.2d 1300. In his reply brief, appellant reasserts his earlier complaints and suggests as an additional position that the evidence adduced on behalf of appellee was "inherently incredible." He neither challenges the qualifications of appellee's witnesses as experts, the relevance of the testimony, nor presents any ground upon which the testimony should have been ruled inadmissible. Thus, it becomes an issue of persuasion. As a last resort, appellant suggests that the chancellor's acceptance of this testimony was arbitrary and capricious. We need only refer to the chancellor's opinion just quoted as support for our disagreement.

### 3. Spendthrift Trusts

■ In *Smith v. Towers*, 69 Md. 77, 14 A. 497 (1888), the Court held spendthrift trusts valid in this State. Generally, income from this type of trust remains beyond the reach of creditors of the beneficiary of the trust. *Safe Deposit & Trust Co. v. Robertson*, 192 Md. 653, 659, 65 A.2d 292 (1948). The definition appearing in Black's Law Dictionary 1256 (rev. 5th ed. 1979), describes a spendthrift trust as

"[a] trust created to provide a fund for the maintenance of a beneficiary, and at the same time to secure it against his improvidence or incapacity. One which provides a fund for benefit of another than settlor, secures it against beneficiary's own improvidence, and places it beyond his creditors' reach."

It is further defined as

"[a] trust set up to protect a beneficiary from spending all of the money that he is entitled to. Only a certain

portion of the total amount is given to him at any one time. Most states permit spendthrift trust provisions that prohibit creditors from attaching a spendthrift trust." (citation omitted).

The four trusts of which appellant is a lifetime beneficiary are spendthrift trusts. All payments are required to be made directly to the beneficiary—not to anyone else. Furthermore, the funds also are not subject to anticipation or assignment, nor are they available for claimed debts or obligations.

Appellant urges that the accepted valuation of what a willing buyer would pay a willing seller is not applicable to a spendthrift trust because it cannot be alienated. While he agrees it is an economic resource, he claims it is not the type which can be valued as though it were saleable. The difficulty in valuing an asset, however, does not preclude it from being valued. *Deering v. Deering,* 292 Md. at 129, 437 A.2d 883.

■■■ Appellee presented expert testimony on the value of the trust. Appellant challenged the value but did not offer an alternative valuation which would take the spendthrift characteristic into consideration. The chancellor announced that he had an obligation to determine what, if any effect, the spendthrift provision had on the valuation. He heard the testimony and accepted the valuation propounded by appellee. We hold that he did not abuse his discretion.

### Considerations in Determining the Award

Following identification of the marital property and its valuation, the statute directs the chancellor to consider nine factors before determining the amount of the monetary award, if any, and the method of payment. Md.Cts. & Jud.Proc.Code Ann., § 3–6A–05, *supra.*[8] Appellant focuses

---

**8.** Now Md.Fam.Law Code Ann., § 8–205. As a result of the division and renumbering of factor (6) as (6) and (7), there are now ten factors.

on several of these factors in challenging the monetary award.

The chancellor must consider the factors, not as ends in themselves, but as aids in reaching the ultimate goal. A plain reading of the statutory language indicates that the chancellor is not restricted to the categories listed. Rather, he may take into account "[s]uch factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award." Md.Cts. & Jud.Proc. Code Ann., § 3–6A–05, *supra.*[9]

Appellant complains here that the chancellor "erred in reviewing and applying the nine factors to be considered in determining what amount, if any, should be awarded." In particular, he complains about factors (1), (3), (7) and (9). We will discuss them in the order presented by appellant.

–First Factor–

"(1) The contributions, monetary and nonmonetary, of each party to the well-being of the family;" Md.Cts. & Jud.Proc.Code Ann., § 3–6A–05(b)(1), *supra.*

■ Appellant argues that there was no evidence to support the chancellor's conclusions that: (1) appellee "was forced to accept the full responsibility for the sons' upbringing"; and (2) he "admitted that he neglected his family obligations ... even to the point of foregoing all but the last hour of his twenty-fifth wedding anniversary...." We disagree. There was such evidence.

–Third Factor–

"(3) The economic circumstances of each spouse at the time the award is to be made;" Md.Cts. & Jud.Proc.Code Ann., § 3–6A–05(b)(3), *supra.*

■ Appellant points out that the chancellor treated him as having debts of only $3,000 and appellee as having debts

---

**9.** Md.Fam.Law Code Ann., § 8–205(a)(10) replaces "such other factors" with "any other factor."

of $684,000. Her debts included attorney's fees and costs of $654,970.43. Since the court ordered him to pay these fees and costs, he contends they should have been treated as his debts and not as the debts of appellee. Hence the chancellor erred.

The chancellor did precisely what appellant claims, and we do agree that he erred in part. In making a monetary award, the chancellor must consider the economic circumstances as they exist at the time he makes the award. *Id.*

When the chancellor made the monetary award, we can infer that he knew the amount he would award as attorney's fees. If he did not, he had ample opportunity to consider it in that light before issuing his decision. The costs of over $200,000, however, are a different matter. When he made the marital award, he had placed the burden of the attorney's fees on appellant, but not the costs. He reserved his decision on that issue pending a subsequent hearing. Thus, the chancellor could not have taken the costs into consideration, because the issue was still to be decided by him. The chancellor cannot properly take a factor into consideration where he has yet to make a decision in that regard or has come to an incorrect conclusion. Since we will remand, we direct that this factor, as ultimately determined by the chancellor, be considered by him.

### –Fourth Factor–

"(4) The circumstances and facts which contributed to the estrangement of the parties;" Md.Cts. & Jud.Proc.Code Ann., § 3–6A–05(b)(4), *supra.*

■■■ Appellant alleges that there was not a scintilla of evidence presented that he "virtually supported [appellee's] dependency on drugs ... [and] for at least the last fifteen or so years, [he] maintained liaisons with other women...." Although appellant may not agree with the chancellor's conclusions, there was evidence to that effect. The chancellor obviously found that testimony credible, and we must accept that evaluation. Md.Rule 1086.

–Seventh Factor–

"(7) How and when specific marital property was acquired, including the effort expended by each party in accumulating the marital property;" Md.Cts. & Jud.Proc. Code Ann., § 3–6A–05(b)(7), *supra*.

 The chancellor stated that appellee "contributed, though non-monetarily, substantially more than [appellant] toward the marital property." Appellant complains that the chancellor failed to specify the efforts appellee expended in accumulating the marital property and that the evidence did not indicate any efforts by her. Moreover, he contends that the largest part of the marital property consists of his interests in Crown benefit plans, and that all of these are attributable to his service as an executive officer of Crown. In his reply brief, appellant further suggests that the court "paid only lip service to this factor" and, in effect, "confused the seventh factor with the first factor." Appellant declares that "[w]hile [appellee's] effort as the homemaker may have enabled [him] to devote more of his time to earning income, this is not a sufficient basis for a conclusion that [appellee] contributed substantially more than [he] toward the marital property." (emphasis supplied). We simply do not agree.

At the outset we note that there is no basis for appellant's assertion that the court confused the first and seventh factor. The record shows that it considered each one thoroughly. Moreover, the basic goal of what has come to be called "The Marital Property Act" is to achieve a fair and equitable distribution. If we were to adopt appellant's legalistic proposition, it would follow that one who does not earn cash can never contribute substantially more than the one who does. This flies in the face of the very purpose of the Act. The conclusion by the chancellor that appellee contributed substantially more toward accumulating the marital property than did appellant, while limited to the unusual situation here presented, is far from clearly erroneous. Md.Rule 1086.

–Ninth Factor–

"(9) Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award." Md.Cts. & Jud.Proc.Code Ann., § 3–6A–05(b)(9), *supra.*

Appellant contends the chancellor stated:

"[t]he only factor set forth by the parties in this category is [appellant's] substantial borrowing capacities."

He claims that the only mention of this alleged borrowing capacity was made by counsel during closing argument. Appellant further points out that the chancellor completely ignored the fact that a large part of the marital property consisted of interests in benefit plans, which were not presently available to him. He additionally notes that perforce a large portion of properties would have to be sold to pay the award resulting in income tax liability. In effect, he contends the chancellor took none of these facts into account, but simply ordered payments without regard to how or when they could be made.

 Interestingly enough, appellee does not point us to any evidence of appellant's alleged substantial ability to borrow. In view of this, we suspect there was no such direct evidence, and we found none. We do conclude that based on the evidence that appellant has taxable income in excess of $700,000 a year, and is a director of numerous corporations, one of which is a bank, it was not unreasonable to infer that appellant had "substantial borrowing ability." We discern, however, there was no evidence that appellant had sufficient borrowing ability to pay the marital award of $1,000,000 within sixty days of the decree, an additional $520,800 within one hundred and twenty days and attorneys fees of $430,390.53 within ninety days. Moreover, the chancellor later directed payment of $224,579.95 for costs without any consideration of appellant's ability to borrow this additional sum. Appellee presented no direct evidence on this subject, and appellant propounded no evidence to the contrary. We hold that in the absence of any

evidence on the subject, the chancellor could not make a finding. There was no factual predicate upon which he could determine whether appellant could borrow the amount awarded.

Appellant suggests that the unavailability of the spend-thrift trust assets should affect the chancellor's decision. He does not tell us what that effect would be. We assume, without knowing, that his complaint concerns the method of payment. If so, appellant posits that the chancellor abused his discretion in ordering that method, because he would not have sufficient assets available to pay the award. We have held that the chancellor erred in concluding appellant had substantial borrowing power to pay the award as ordered, based upon the evidence before him. On remand, the chancellor should reconsider the monetary award and method of payment in light of appellant's ability to pay, or borrow and repay.

### –Income Taxes–

█ Appellant's last point, involving the potential income tax consequences, gives us greater concern than his previous assertions. As we said earlier, we hold that potential income taxes do not alter the value of an asset for purposes of determining the value of either marital or non-marital property. We also hold, however, that under certain circumstances it may be another factor to consider in establishing the amount and method of payment of any monetary award.

Appellant claims that the chancellor erred in not appraising the amount of income taxes for which he has been or will be liable.[10] Specifically he argues that the court erred by not considering:

---

10. Appellant also attempts to raise a multiplicity of tax questions concerning the valuation of ATAPCO stock which include: real estate taxes on ATAPCO real estate; tax credits on the marine operation's vessels; liabilities for deferred income taxes to be paid by ATAPCO and; liabilities for federal and state income taxes if the assets are disposed of at values greater than their original tax cost or basis. He

(1) the income taxes he would have been required to pay had he received the imputed interest on the loan to Dorothy Bohny; (2) the deferred income taxes he will have to pay upon realization of benefits under the retirement plans; [11] and (3) the gain on the sale of assets he will be required to sell to pay the monetary award.

The appellate courts of this jurisdiction have not previously determined whether tax consequences should be considered in valuing marital and non-marital assets for purposes of making a monetary award. We, therefore, will examine the decisions of other jurisdictions which have addressed the question. Three of them—New York, Oregon and Wisconsin—are equitable distribution states; the remaining two—California and Arizona—are community property states. Fam.L.Tax Guide (CCH) ¶ 3504, *supra.*

In Wisconsin, a statute requires the trial court to consider the "[t]ax consequences to each party" in dividing the marital property. Wis.Stat.Ann., § 247.255(10) (Wis.1977). The Wisconsin Court of Appeals has interpreted this provision to mean that, in valuing a pension, future tax consequences must be taken into account. *Selchert v. Selchert,* 90 Wis.2d 1, 280 N.W.2d 293, 297 (1979).

In New York and Oregon, the courts have held that when a spouse is awarded a share of the husband's pension on an "if, as and when" received basis, the wife's interest should be reduced by a proportionate share of the taxes when she receives it. *Majauskas v. Majauskas,* 94 A.D.2d 913, 464 N.Y.S.2d 913 (1983), *aff'd.* 61 N.Y.2d 481, 474 N.Y.S.2d. 699,

---

does so, however, by referring us to designated portions of the record extract rather than setting forth the arguments in his brief. These issues are not properly presented for our review. Md.Rule 1031 c5 (See n. 7, *supra*).

**11.** It is not apparent from appellant's brief whether his contention is that the tax consequences should have been taken into account on all of the retirement plans or only on the Crown Savings Plan and the ESOP. In his reply brief, however, he indicated that the deferred income taxes should have been considered on all of the plans. We will discuss the issue as it relates to all of them.

463 N.E.2d 15 (1984); *In the Matter of the Marriage of Rogers and Rogers,* 47 Or.App. 963, 615 P.2d 412 (1980).

The California and Arizona trial courts have ignored future tax consequences in valuing a pension, because "[t]he taxes are not 'immediate and specific,' but instead are payable in the future and the exact amount is speculation." *In Re Marriage of Marx,* 97 Cal.App.3d 215, 159 Cal.Rptr. at 220; *Johnson v. Johnson,* 131 Ariz. 38, 638 P.2d 705, 710 (1981). In *Marx,* the court pointed out: "[i]t is true that tax consequences can be important in this type of situation . . . [I]t is conceivable that the future maturity date [of a pension] could be so close to the date of trial that the tax consequences could be determined and could qualify as 'immediate and specific'." *Id.* 159 Cal.Rptr. at 220, n. 5.

The Wisconsin statute, unlike that of Maryland, requires that the court consider tax consequences, hence we do not find that decision applicable. The other states where the issue has been decided have no such requirement.

California and Arizona, the community property states, while ruling that tax liabilities are not generally to be considered as being too speculative have left the way open to assess tax consequences where they are not speculative. Oregon and New York, when applying the "if, as and when" payment method to pensions, have both approved taking income taxes into consideration. We find these decisions totally consistent. The basis for refusing to consider tax consequences is that they are too speculative—the rates may change, either by legislation or by tax bracket, and the income may be sheltered in any number of ways. This rationale fails, however, when we are confronted with a determinable payment (such as the percentage of a pension) on an "if, as and when" basis.

█ How to consider those taxes presents another issue. Md.Cts. & Jud.Proc.Code Ann., § 3–6A–05, *supra,* requires that marital property be valued for purposes of making a monetary award. Under Maryland law, value means fair market value, *see Gravenstine v. Gravenstine,* 58 Md.App.

at 172–173, 472 A.2d 1001, which is defined as "the amount at which property would change hands between a willing buyer and a willing seller. . . ." Black's Law Dictionary 537, *supra.* Value is the "estimated or appraised worth" of property, *Id.* at 1391, not its appraised worth minus taxes. It follows, then, that taxes should not be taken into account in valuing property before making a monetary award. Rather, the court should consider them as an "other factor" under Md.Cts. & Jud.Proc.Code Ann., § 3–6A–05(b)(9), *supra. See, Spessard v. Spessard,* 64 Md.App. 83, 494 A.2d 701 (1985).

▬▬▬▬ In the case before us, appellant's tax liabilities for the imputed interest on the loan to Dorothy Bohny are "immediate and specific," as evidenced by his tax returns for 1981 through 1983.[12] Had he received the interest, it would have been subject to income taxes which are easily and specifically ascertainable. Thus, on remand, the chancellor should consider as an "other factor" the resultant liability on the imputed interest in making the monetary award. Appellant's future tax liabilities on the retirement plans, and any gain on the future sale of assets, on the other hand, are speculative; therefore, they need not be considered.

### Computation of the Monetary Award

Additionally, appellant contests the chancellor's arithmetic in computing the monetary award, pointing out that the marital property was valued at $2,886,509.40 and was overstated by at least $1,000,000. He rounds this off and says the marital property was $1,800,000. He then reduces the sum by $460,000 for the house and contents, claiming the marital property was $1,340,000. The monetary award was $1,520,000 plus $89,000 attributable to the wife's jewel-

---

12. The 1984 tax returns were not in evidence for the obvious reason that they were not available or filed. In making an equitable disposition, any such liability should be considered in light of the evidence already presented.

ry. Hence, he claims the chancellor awarded the appellee more than one hundred percent of the marital property.

We find the premise on which appellant bases his arithmetic to be faulty. The chancellor found the value of the marital property was $2,886,509.40. Since we do not accept the proposition that the value of the retirement funds is overstated by one million dollars, the monetary award does not exceed the value of the marital property. Additionally, it is not proper to exclude the home and contents from the marital property where there is no use and possession order. Furthermore, the statute does not require that the disposition place the parties in parity.

██ One error is apparent, however, in connection with the computation. In his original opinion, the chancellor included appellee's jewelry as joint personal property subject to equal division between the parties. In the Supplemental Memorandum Opinion and Supplemental Order, however, he modified the findings, stating

"In conferring the gifts of jewelry, [appellant] intended that [appellee] would be the sole owner thereof and that [he] would have no further interest of any kind therein."

This designation of the jewelry as a gift would reduce the joint personal property by $89,000 and increase appellee's individual assets by that amount. In view of the chancellor's thorough crafting of the other changes in his findings, we assume this was an oversight. If the chancellor did not, and it appears he did not, reconsider the monetary award in view of this finding, he erred. This should be addressed on remand.

### The Cross Appeal

Appellee/Cross-Appellant also seeks review of the monetary award on appeal; therefore, we will address that issue at this juncture and later return to the balance of appellant's contentions.

While appellee states two questions in her brief, she essentially claims only one error—that the chancellor failed

to include the increased value of the ATAPCO stock as marital property. She explains that at various times Mr. Rosenberg became the beneficiary of life interests or residuary interests in several trusts. The corpus of the four life interest trusts was comprised largely of ATAPCO stock. ATAPCO, in turn, held about 50% of the voting stock of Crown. It is these four trusts which here concern us. They were all gifts or inheritances and, admittedly, non-marital property at the inception. Through the efforts of appellant, his family and other influences, the value of the trusts grew substantially during the marriage. Hence, appellee claims Mr. Rosenberg's interest in that increased value should have been included as marital property.

Marital property is "all property, however titled, acquired by either or both spouses during their marriage. It does not include property acquired prior to the marriage, property acquired by inheritance or gift from a third party, or property excluded by valid agreement or property directly traceable to any of these sources." Md.Cts. & Jud.Proc. Code Ann., § 3–6A–01(e), *supra.* When property is paid for over a period of time, it is deemed to have been the subject of a continuing acquisition. Thus, if the funds used are partly marital and partly non-marital, the property retains the same character based on the source of those funds, i.e., it is considered partly marital and partly non-marital. *Grant v. Zich,* 300 Md. 256, 270, 477 A.2d 1163 (1984); *Harper v. Harper,* 294 Md. 54, 448 A.2d 916 (1982).

Appellee would apply the theory of continuing acquisitions to the increase in value of appellant's interest in these trusts. She suggests that there is a spectrum of cases dealing with similar situations. *Brodak v. Brodak,* 294 Md. 10, 447 A.2d 847 (1982), upon which she relies, is on one end and *Schweizer v. Schweizer,* 55 Md.App. 373, 462 A.2d 562 (1983), *aff'd. and remanded,* 301 Md. 626, 484 A.2d 267 (1984), is on the other.

In *Brodak,* the husband received a trailer park from his parents. While the husband was the sole proprietor, the

wife did work in the park. They added three trailers to the park during the marriage. The Court of Appeals held the trailers were marital property, stating that the "funds to purchase those trailers was [sic] partly generated through the efforts of the wife and thus cannot be said to be directly traceable to the gift." *Id.* [294 Md.] at 27, 447 A.2d 847. Conversely, the husband in *Schweizer* owned stock of a corporation in which he served on the board of directors; the stock was admittedly non-marital. The wife sought to have the increased value of the stock declared marital property, because her husband's efforts, which increased the value, had been expended during their marriage. She was unsuccessful in her efforts.

In *Gravenstine v. Gravenstine, supra,* the parties reinvested the cash dividends received on non-marital stock in additional stock in the same corporation. This Court held that new stock was marital property. Effectively, the additional shares of stock were deemed marital. In *Wilen v. Wilen,* 61 Md.App. 337, 486 A.2d 775 (1985), and *Mount v. Mount,* 59 Md.App. 538, 476 A.2d 1175 (1984), we held the increase in the value of non-marital assets that were directly traceable to those assets retained that character. In *Wilen, supra,* the husband acquired certain stock before the marriage, and a split of that stock was held non-marital property. The husband also acquired before the marriage half of the stock in another company of which he was President. That stock increased in value. This Court affirmed the chancellor's decision that this also was non-marital property. Likewise, in *Mount, supra,* the husband was a 10% owner and an employee of a corporation. The stock dividend he received in a wholly-owned subsidiary was held to be non-marital.

In his opinion, the chancellor spelled out in great detail the growth and expansion of ATAPCO and Crown. While of substantial interest, a repetition of that history is not necessary to a resolution of this issue. The chancellor did find that

"[n]ext to ATAPCO's stock holdings in these companies, the most profitable assets owned by ATAPCO were acquired during the dominance of Jacob Blaustein: four of the five marine vessels producing the Marine Division's profit, the Blaustein Building and Wilshire Square I building, the Wilshire Square II and Grace properties, a large part of the oil properties and Atlas Sound. [Appellee] has not shown that [appellant] in any way contributed to the increase in value of these assets.

"No evidence was produced from which the Court on a basis other than speculation can ascertain the effect the increase in value of ATAPCO's holdings in Crown and the dividends ATAPCO received from Crown had on the value of ATAPCO stock.

"The Court finds that [appellee] has not proven that [appellant's] personal efforts at Crown or as a member of the Board of Directors of ATAPCO either directly or indirectly contributed to the increase in value of [appellant's] life interests in ATAPCO. ATAPCO's worth increased not by [appellant's] personal efforts in either Company but, rather, because of a variety of factors. These factors include the increase in value of the shares held by ATAPCO in Standard Oil of Indiana and other companies and the increases in value and earnings of ATAPCO's subsidiaries and other assets. The value of Crown also increased as the result of many factors, especially those factors generally affecting the petroleum industry such as the oil embargo and resulting oil shortages in the 1970's. For the aforestated reasons, the Court finds the accretion in [appellant's] life interests in ATAPCO to be non-marital property."

 Appellee does not directly attack those findings, but claims the facts established that there was a joint venture by the family, and therefore, each was the agent for the other and an increase for one is an increase for all. Although an interesting theory, that is not the test. Appellant only had one voice on these various boards. The

chancellor's findings were not clearly erroneous. Md.Rule 1086.

## ALIMONY

In his brief, appellant asserts that "[t]he Chancellor abused his discretion in determining the amount of [the] alimony award and its duration." We will address his contentions concerning the duration of alimony first, and then we will discuss the amount of the award.

### *Indefinite Alimony*

In 1980, common law concepts of alimony were changed significantly by the enactment of Md.Code Ann., Art. 16, § 1, *supra*.[13] Previously, when alimony was awarded, it "was for the joint lives of the parties or until the recipient remarried, subject to modification upon a subsequent material change in circumstances." *Holston v. Holston*, 58 Md.App. 308, 473 A.2d 459 (1984). *See also Harman v. Harman*, 61 Md.App. at 560, 487 A.2d 689.

Under the current statute, the principal function of alimony is rehabilitation:

> "the concept of alimony as a lifetime pension enabling the financially dependent spouse to maintain an accustomed standard of living has largely been superseded by the concept that the economically dependent spouse should be required to become self-supporting, even though that might result in a reduced standard of living."

*Holston*, 58 Md.App. at 321, 473 A.2d 459.

The court may award alimony for an indefinite period of time, however, when it finds that:

> "(i) The party seeking alimony, by reason of age, illness, infirmity, or disability, cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

---

13. Now Md.Fam.Law Code Ann., § 11–101 et seq. (1984).

"(ii) Even after the receiving party will have made as much progress toward self-support as can reasonably be expected, the respective standards of living of the two parties will be unconscionably disparate."

Md.Code Ann., Art. 16, § 1(c)(1), *supra.*

In the case *sub judice* the chancellor found that appellant "will continue as a high level executive at Crown and will most probably become more involved at ATAPCO. He will reap the benefits of his family's history of investment in ATAPCO and Crown for the rest of his life. In all, [appellant's] life will not be financially altered a great deal after his divorce is granted."

He further found that appellee

"is in a totally different situation. She needs money for her everyday living expenses and has been totally dependent upon [appellant] for such funds for almost thirty-two years ... [She] alone will never become sufficiently self-supporting to allow her to continue the life style she shared with her husband for over thirty years ... [She] has no specialized skills to enable her to enter the workplace at a level which would allow her to attain her married standard of living, and it is unlikely that she will develop such skills at this stage of her life."

The chancellor then concluded, referring to appellant's proposed findings and conclusions, that

"as [appellant] points out in his proposed Findings of Fact and Conclusions of Law, there are two circumstances under which the court may award alimony for an indefinite period of time, one being when the respective living standards of the parties will be 'unconscionably disparate' even after the recipient makes as much progress towards being self-supporting as can be reasonably expected. This is clearly the situation here." (citation omitted).

■ Interestingly despite his contentions in his brief, appellant appears to have abandoned this argument in his reply brief where he stated that he "does not contend that the Circuit Court erred in awarding alimony for an indefi-

nite period." In any event, we hold that the court did not err in awarding appellee indefinite alimony.

### Amount of the Award

Appellant next contends that the court's alimony award to appellee of $275,000 a year is "grossly excessive." In support of this argument, he asserts that during the marriage he provided her with a monthly household allowance of $6,000 per month and that after the separation he "voluntarily increased this amount to $7,000 per month...." He concludes that these amounts reflect the parties' standard of living and, therefore, the court erred in awarding her "as alimony 3.27 times the amount of money she received before the divorce."

According to appellant, the chancellor abused his discretion, in that

"[h]is award of alimony when coupled with the income which would be produced from investment of the monetary award would provide [appellee] with an income vastly in excess of her reasonable needs, vastly in excess of the standard of living which was established during the marriage and which continued during the period of separation, and vastly in excess of her claimed needs."

In determining the amount and duration of alimony, the court must consider all relevant factors, such as

"(1) The financial needs and resources of both parties, including:

(i) All income and assets, including nonincome-producing property;

(ii) Any award made under §§ 3–6A–05 and 3–6A–06 of the Courts and Judicial Proceedings Article;

(iii) The nature and amount of the financial obligations of each party; and

(iv) The respective rights of the parties to receive retirement benefits.

(2) The ability of the party seeking alimony to be wholly or partially self-supporting;

(3) The time deemed necessary by the court for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(4) The standard of living of the parties established during the marriage;

(5) The duration of the marriage;

(6) The contributions, monetary and nonmonetary, of each party to the well-being of the family;

(7) The facts and circumstances leading to the estrangement of the parties and the dissolution of the marriage;

(8) The age and the physical and mental condition of each party;

(9) Any agreement between the parties;

(10) The ability of the party from whom alimony is sought to meet his or her needs while meeting those of the party seeking alimony; and

(11) Such other factors as the court deems it necessary or appropriate to consider in order to arrive at a fair and equitable award of alimony."

Md.Code Ann., Art. 16, § 1(b), *supra.*

We note at the outset that the record shows appellee estimated her actual monthly expenses for 1984 at $10,088 per month. In addition, she deferred expenses of $7,881, which included contributions, car leasing, furnishings, household maintenance, vacation and travel, furs, insurance, clothing, dental expenses, legal and accounting fees. The amount of alimony sought would have carried an income tax expense of $14,000 a month, making her total expenses $31,969 per month. Appellee was awarded approximately $22,900 per month. Because she was receiving only $7,000 each month from appellant, she borrowed funds to pay some of her expenses, deferred payment on expenses already incurred and delayed incurring any obligation on still others. The fact that appellant was giving her a household allowance during the marriage of $6,000 a month and was paying her $7,000 a month after the separation is in no way indicative of her total needs. The *pendente lite*

support is indicative only of appellant's ability to pay that amount as alimony following a divorce. *Maynard v. Maynard,* 42 Md.App. 47, 399 A.2d 900 (1979).

The chancellor reduced the alimony sought by $108,628 per year or $9,000 a month. He was required to take into account, among other things, her actual expenses and her needs. He was also required specifically to consider any monetary award.

In making the monetary award, the chancellor shall consider

"[a]ny award or other provision which the court has made under this Subtitle 6A with respect to family use personal property or the family home, and any award of alimony;"

Md.Cts. & Jud.Proc.Code Ann., § 3-6A-05(b)(8), *supra.*

There is no dispute that the chancellor complied with this requirement. In making an alimony award, however, corresponding requirements must be considered:

"(1) The financial needs and resources of both parties, including:

(i) All income and assets, including nonincome-producing property;

(ii) Any award made under §§ 3-6A-05 and 3-6A-06 of the Courts and Judicial Proceedings Article."

Md.Code Ann., Art. 16, § 1(b)(1), *supra.*

As the Court of Appeals noted in *McAlear v. McAlear,* 298 Md. 320, 469 A.2d 1256 (1984):

"We recognize ... that there is an interrelationship between a monetary award granted pursuant to § 3-6A-05 of the Courts and Judicial Proceedings Article and an award of alimony granted pursuant to Md.Code Art. 16, § 1 ... [I]n determining the amount of a monetary award, equity courts must consider any award of alimony, while in determining the amount of alimony, equity courts must consider any monetary award."

*Id.* at 347, 469 A.2d 1256.

In awarding alimony, the chancellor noted that appellant

"estimated his expenses at $176,000, while [appellee], not including income taxes due, estimated hers at $215,628. These estimates are taken by the Court with a grain of salt; they are rough estimates useful for comparison but subject to a reduction for over-estimation [sic] and inclusion of inappropriate expenses, such as a fur allowance of $3,000 per year...."

The only mention the chancellor made of the monetary award in conjunction with alimony was when he stated

"[c]areful management of the monetary award ordered by the Court will enable [appellee] to meet some of her expenses and start a new life, but [appellee] alone will never become sufficiently self-supporting to allow her to continue the life style she shared with her husband for over thirty years."

There is no question as to the ability of appellant to meet his financial needs as well as those of appellee. The chancellor noted that appellant enjoyed a pre-tax income of between $825,383 and $850,924. Furthermore, he indicated that appellant "estimated his expenses at $176,000," and appellee estimated hers to be $215,628, not including income taxes due. The chancellor then concluded that

"It is evident from the figures presented at trial and those stated in this Opinion that [appellant] can well afford to meet his needs while meeting those of [appellee]."

We cannot be positive from the chancellor's opinion whether he considered the income that would accrue from the monetary award, or whether he abused his discretion in allowing virtually the full amount of alimony sought. We are inclined to believe that he failed to take the income from the monetary award into consideration since he specifically referred to the overestimation of expenses. We are further supported in this approach by our review of the record which revealed a dearth of evidence to support the full amount of alimony claimed. In addition, the chancellor

commented that appellee's income was limited to "dividends from non-marital stock totaling $3,173.80."

 If, on the other hand, he did consider the income on the monetary award, the reductions made must have been only superficial. We conclude this because of the income which would have been generated by the monetary award. The chancellor used 11% as an acceptable rate of interest for other purposes in his decision. That rate when applied to the monetary award will produce in excess of the amount of the reduction in alimony. In order to fulfill our obligation to review the case on the law and the evidence, we remand to the chancellor to determine the financial needs and resources of appellee including the effect of the monetary award and all other income. Based on these findings, the chancellor must then review the alimony award.

## FEES AND COSTS

The large fortune involved in this case resulted in each issue and potential issue being fought every inch of the way. As a consequence, the lengthy and broad discovery, the long trial and the numerous post-trial hearings generated substantial attorneys' fees and litigation costs for both parties. Over vehement objections, appellee's counsel was awarded $430,390 in attorneys' fees and $224,579 for costs.

Appellant challenges these awards, claiming that the costs were needlessly incurred by appellee's counsel mostly in connection with their unsuccessful attempt to have the appreciation of the ATAPCO stock classified as marital property. He further contends that the fees were not reasonable and necessary as required by Md.Code Ann., Art. 16, § 3, *supra*.[14]

A large portion of the fees and costs were generated in relation to that issue; hence, we will deal with the two together. Appellant's diverse and complex holdings necessitated a thorough analysis of the marital property cases by

---

14. Now Md.Fam.Law Code Ann., § 11–110.

counsel. As the chancellor stated at the separate hearing on costs,[15]

"[it] would have been negligence and I think probably an outrage on the part of [appellee's attorney] if he did not pursue all reasonable ends to show what alimony his client was entitled to and what property she was entitled to and what the total marital and non-marital worth of both parties was...."

The fact that ATAPCO stock constituted the bulk of appellant's assets and that the court held that it was non-marital property does not make frivolous efforts by appellee's counsel to prove it was marital property. ATAPCO stock still had to be valued as it was part of the non-marital assets. It needed to be considered for purposes of making the monetary award. Md.Cts. & Jud.Proc.Code Ann., § 3–6A–05(b)(2), *supra*.

■ According to Md.Code Ann., Art. 16, § 3, *supra* "after considering the financial resources of both parties, their respective needs ... [the court may award] a reasonable amount for reasonable and necessary expenses, including suit money, attorney's fees, and costs, of instituting or defending any proceeding...."

The award of fees and costs is within the "sound discretion of the trial court, and such an award should not be modified unless it is arbitrary or clearly wrong." *Gravenstine v. Gravenstine*, 58 Md.App at 182, 472 A.2d 158, citing *Lopez v. Lopez*, 206 Md. 509, 520–21, 112 A.2d 466 (1955). Although every single person that performed work for appellee's attorney did not appear in court, her attorneys stated that they supervised and directed those persons. The testimony also showed that the attorneys' fees were calculated at the firm's regular rates. Finally, most of the costs billed

---

15. A separate hearing was held because appellee's counsel failed to elicit evidence on the costs of each expert during their trial testimony. Though this resulted in an additional hearing, appellant failed to show prejudice because the bills submitted were only services rendered up to and during the trial itself.

were lower than those usually charged by others in the same fields of expertise, and the charges were customary under the circumstances.

▋▋▋▋▋ The chancellor may make a fee award based upon the record, his observations at trial as well as his own experience. *Sharp v. Sharp,* 58 Md.App. at 406, 473 A.2d 499; *see Foster v. Foster,* 33 Md.App. 73, 77, 364 A.2d 65 *cert. denied,* 278 Md. 722 (1976). The chancellor found both the fees and costs to be reasonable and necessary under the circumstances. We hold that he did not abuse his discretion in making those awards.

The amount of the awards for attorneys' fees and costs depend upon the linchpins of alimony and the monetary award. Since, on remand, these linchpins will in all likelihood be reduced, we would ordinarily remand the issue of costs and fees also. Here, however, the appellee was awarded the full amount requested, which awards we are affirming. Hence, there is no basis for further modification of these fees and costs on remand.

## SUMMARY

We have affirmed the chancellor's:

(a) determination that appellant's loans and cash advances to Dorothy Bohny and, the interest thereon, are marital property;

(b) valuation of appellant's pension and retirement accounts, including the date of their valuation;

(c) valuation of appellant's trust interests;

(d) consideration of the statutory factors in granting the monetary award with the exception of certain "other factors" specified;

(e) determination that the increase in value of the ATAPCO stock is not marital property;

(f) determination that he need not consider appellant's future tax liabilities on the retirement plans and on any

gain on the future sale of his assets in making the monetary award;

(g) award of indefinite alimony to appellee; and

(h) award of fees and costs to appellee. We are remanding the case so that the chancellor may:

(a) consider the effect of his designation of appellee's jewelry as her personal asset on the amount of the monetary award;

(b) consider appellant's tax liabilities for the imputed interest on the Bohny loan as an "other factor" in making the monetary award;

(c) consider the awards of fees and of costs in determining the economic circumstances of each party at the time the monetary award is to be made.

(d) consider the monetary award and method of payment in light of appellant's ability to pay, or borrow and repay; and

(e) consider the monetary award and the income appellee will accrue from it, her other income, and/or the evidence of need of appellee in awarding alimony to her.

AFFIRMED IN PART. REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY APPEL-LANT/CROSS–APPELLEE AND ONE–HALF BY APPEL-LEE/CROSS–APPELLANT.