545 A.2d 35

**David M. NIROO**

v.

**Mojgan V. NIROO.**

**No. 121, Sept. Term, 1987.**

Court of Appeals of Maryland.

Aug. 3, 1988.

Paul Mark Sandler (Ralph E. Wilson and Freishtat and Sandler, on brief), Baltimore, for appellant.

Bruce A. Kaufman (Rosenthal & Kaufman, P.A., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

The question presented is whether anticipated renewal commissions on insurance policies sold by a spouse during marriage but accruing after dissolution of the marriage are "marital property" within the meaning of the Property Disposition in Divorce and Annulment Act (the Act), Maryland Code (1984), § 8–201(e) of the Family Law Article; this section defines "marital property" as

> "property, however titled, acquired by 1 or both parties during the marriage.
>
> (2) 'Marital property' does not include property:
> (i) acquired before the marriage;
> (ii) acquired by inheritance or gift from a third party;
> (iii) excluded by valid agreement; or
> (iv) directly traceable to any of these sources."

## I.

The appellant, David Niroo (the husband) contests a monetary award to the wife imposed pursuant to a divorce decree of the Circuit Court for Montgomery County (Messitte, J.). In particular, he challenges the determination of the trial judge that future renewal commissions accruing on insurance policies sold by him or his agents during the marriage were marital property.

The couple was married in 1977. In 1978, the husband began work as an insurance salesman for Pennsylvania Life Insurance Company (Penn Life); pursuant to contract, he received commissions on individual policies sold. In 1980, he became a branch manager and entered into agency manager agreements with Penn Life and the Executive Fund Life Insurance Company. Under these agreements, the husband shared in the profits (and the losses) of the company as determined by specific "office codes," or blocks of insurance, assigned to agents under him and for whom he was responsible. The husband was entitled under the agreements to receive income derived from net profits generated if and when insurance policies coming under his office codes were renewed, provided that certain conditions in the agency manager agreements were satisfied. In particular, the contracts included, *inter alia*, a covenant not to compete, an exclusivity clause, and a required renewal volume. The agreement specified that the husband's "proportional share of the Agency profits shall be vested in him even if he is permanently and totally disabled, or after his death in his heirs and assigns."

At trial, both parties presented expert testimony as to the present day value of these renewal commissions after expenses were deducted, *i.e.*, what the husband could expect to receive from the renewal policies. This valuation was based on industry "persistency rates," explained by the husband's expert witness as "the portion of the premiums that are in force in one year that renew and hence are paid and are still in force in the following year." This expert included only those renewal commission profits on policies sold during the marriage.

The trial judge determined that the husband's interest in the renewal income constituted marital property. He accepted the valuation testimony of the husband's expert and found the present discounted profit value of the renewal commissions to be $410,000. The court also took into account various "advances" made to the husband by the insurance companies which were chargeable against renew-

al commissions. Under the agreements, these advances were considered as loans, repayable on demand. At the time of trial, the husband was indebted to the companies in the amount of $267,000. In assessing the proper amount to be awarded to the wife, the trial judge determined that although the renewal income was marital property, the husband's $267,000 debt was not marital debt, but instead was to be taken into account as an "economic circumstance." The court arrived at a final monetary award of $200,000; in doing so, it considered various statutory factors, including the economic circumstances of the parties.

The husband appealed. We granted certiorari prior to consideration of the appeal by the Court of Special Appeals to consider the important question involved in the case.

## II.

In 1978, in response to recommendations proposed by a special commission established by the Governor, the General Assembly enacted ch. 794, the Property Disposition in Divorce and Annulment Act, which significantly changed traditional notions as to property rights between spouses upon dissolution of the marriage.[1] Enacted to remedy the inequities inherent under the previous system of allowing the property to remain with whichever spouse held title to it during the marriage, the Act, now codified as Code (1984), §§ 8–201 through 8–213 of the Family Law Article, mandates that title alone is not the determining factor in disposing of marital assets. Although the statute does not authorize the court to transfer title, nor require that all property be evenly divided, it does allow the trial judge to make a

---

1. For a history of the prior law and the enactment of the current law, including a discussion of the Report of the Governor's Commission on Domestic Relations Law (1978), *see Harper v. Harper,* 294 Md. 54, 61–64, 448 A.2d 916 (1982) and *Deering v. Deering,* 292 Md. 115, 122, 437 A.2d 883 (1981). *See also* Comment, *Property Disposition Upon Divorce in Maryland: An Analysis of the New Statute,* 8 U.Balt.L.Rev. 377 (1979).

monetary adjustment to more fairly and equitably allocate the various property interests between the divorcing spouses. In essence, as we recently explained in *Unkle v. Unkle*, 305 Md. 587, 595, 505 A.2d 849 (1986), the statute provides that

"nonmonetary contributions within a marriage should be recognized in the event that a marriage is dissolved; that a spouse whose activities do not include the production of income may nevertheless have contributed toward the acquisition of property by either or both spouses during the marriage; that when a marriage is dissolved the property interests of the spouses should be adjusted fairly and equitably, with careful consideration given to both monetary and nonmonetary contributions made by the respective spouses; and that the accomplishment of these objectives necessitates that there be a departure from the inequity inherent in Maryland's old 'title' system of dealing with the marital property of divorcing spouses."

To effectuate this realignment of assets, the statute imposes a three-step process whereby the trial judge first determines what property is marital property, § 8–203(a); then assigns a value to it, § 8–204; and thereafter may grant a monetary award to whichever spouse would not otherwise receive his or her fair share of the marital assets, § 8–205(a). In determining the proper amount and method of payment of this award, the court must consider the following factors provided under § 8–205(a):

"(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property was acquired, including the effort expended by each party in accumulating the marital property;

(9) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(10) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award."

## III.

The husband first challenges the trial judge's determination that renewal commissions on policies sold during the marriage are marital property. He asserts that due to the speculative and contingent nature of these commissions, they are not within the definition of marital property, as contemplated by the legislature in § 8–201(e). Furthermore, he argues that as it is necessary for him to "work" and nurture these accounts through activities performed after the marriage was dissolved, the income thereby derived is not "acquired" during the marriage. Thus, he contends, classification of renewal commissions as marital property would improperly give his former wife the fruits of his future efforts and would penalize him if the renewal commissions were not actually realized.

As a preliminary matter, we have repeatedly noted that the meaning of property within the statutory definition of "marital property" encompassed in § 8–201(e) " 'embraces everything which has exchangeable value or goes to make up a man's wealth—every interest or estate which the law regards of sufficient value for judicial recognition.' " *Deering v. Deering*, 292 Md. 115, 125, 437 A.2d 883 (1981), *quoting Diffendall v. Diffendall*, 239 Md. 32, 36, 209 A.2d 914 (1965). *Accord Queen v. Queen*, 308 Md. 574, 577, 521 A.2d 320 (1987); *Unkle v. Unkle*, 305 Md. 587, 590, 505 A.2d 849 (1986); *Archer v. Archer*, 303 Md. 347, 356, 493 A.2d 1074 (1985). Furthermore, in *Unkle, supra*, 305 Md. at 590,

505 A.2d 849, in considering the meaning of "property" under the Act, we quoted from *Bouse v. Hutzler,* 180 Md. 682, 686, 26 A.2d 767 (1942), that "when used without express or implied qualifications, [property] may reasonably be construed to include obligations, rights and other intangibles as well as physical things."

Under this broad concept of property, we have found that marital property includes: that portion of a husband's workers' compensation award for permanent partial disability which compensated for wages lost during the marriage, *Queen v. Queen, supra;* pension rights accumulated during the marriage, *Deering v. Deering, supra;* and a work-related contributory disability pension plan, *Lookingbill v. Lookingbill,* 301 Md. 283, 483 A.2d 1 (1984). On the other hand, we have found the following interests not includable as marital property: an inchoate personal injury claim arising from an accident occurring during the marriage, *Unkle, supra,* and a medical degree or license, *Archer, supra.*

In *Deering, supra,* we found that the right to pension benefits accumulated during marriage was a contractual right and therefore enforceable as a property right rather than as a mere conditional expectation.[2] There, we said that the proper analysis to be applied was, first, to decide whether the property right was acquired during the marriage and secondly, whether it is equitable to include it as marital property, without regard to whether the right is vested or not. Moreover, we noted that the fact that the right to the pension benefit may be contingent upon continued employment did not matter, as such contingent future interests constituted property. Finally, it was clear in *Deering* that both spouses were relying on the pension benefits to provide for their future, so that an equitable distribution of the benefits was indeed proper. *See also Lookingbill v. Lookingbill,* 301 Md. 283, 483 A.2d 1 (1984).

---

**2.** Since the *Deering* case was decided, § 8–205(a) has been enacted specifically covering the disposition of pension rights and other similar rights upon dissolution of marriage.

Recognizing the employment related nature of workers' compensation benefits, we held in *Queen, supra,* that that portion of the husband's award which compensated for the loss of earning capacity during the marriage was marital property, while his loss of future earning capacity arising after dissolution of the marriage was not marital property. We reached a similar conclusion in *Unkle v. Unkle, supra,* finding that a personal injury claim arising from an injury which occurred while the injured spouse was married was so uniquely personal that it could not be considered marital property "acquired" during the marriage, as required by the statute. Instead, we found that the claim

> "arose from purely fortuitous circumstances and not from any on-going marital initiative to acquire marital assets. The claim simply accrued to the injured spouse as a result of an accident and was his separate property." 305 Md. at 596, 505 A.2d 849.

The personal nature of a medical degree and license to practice medicine was found dispositive in *Archer v. Archer, supra,* where we held that the degree should not be considered part of the couple's marital assets. In distinguishing a medical degree from the contractual right to receive pension benefits, we found that the professional degree represented a

> "mere expectancy of future enhanced income.... The [degree] is but an intellectual attainment; it is not a present property interest. It is personal to the holder; it cannot be sold, transferred, pledged or inherited. It does not have an assignable value nor does it represent a guarantee of receipt of a set monetary amount in the future, such as pension benefits." 303 Md. at 357, 493 A.2d 1074.

■ When analyzed under the principles set forth in our cases, we think it clear that contractually vested rights in renewal commissions are a type of property interest encompassed within the definition of marital property under § 8–201(e). That an insurance agent has a vested right in commissions on renewal premiums when provided for by

contract is well settled. *Travelers Ins. Co. v. Hermann,* 154 Md. 171, 185, 140 A. 64 (1928); *see* 16B Appleman, *Insurance Law and Practice,* § 9001 (1981) and *Couch on Insurance 2d,* § 26A:231 (1981) for citations from other jurisdictions. This contractual right was clearly established in the husband's agency contract whereby Penn Life agreed to pay him a stipulated percentage of renewal premiums collected in the future. Indeed, this right to renewal premiums cannot be terminated unilaterally by the company, but instead would require an affirmative surrender by the agent to forfeit the future commissions due. *See Couch on Insurance, supra,* at § 26A:232.

 In this case, the agency contract provided that should the husband die or become disabled, his right to receive the renewal commissions, as well as his heirs' right thereto, would not be affected. We note also that under the agency agreements the husband's right to the renewal commission was assignable with the prior written consent of the company. *See also Fitch v. Pacific Life Ins. Co.,* 54 Cal.App.3d 140, 126 Cal.Rptr. 445 (1975), in which the court upheld the assignment of the right to future renewal commissions between an insurance agent and the general agent, reasoning that the assignment was not rendered uncertain because the insurance agent was assigning commissions that he had not yet received. Thus, considering the legal attributes of a contractual right to renewal commissions, the husband's right amounts to more than a "mere expectancy," or a "mere historical possibility of gain" as he alternatively characterizes it.

The husband claims that after the dissolution of the marriage, he must continue to "service" his accounts after their initial procurement if he is to realize the renewal commissions. He thereby seeks to distinguish his situation from that involving pension benefits. We are not persuaded by his argument. The husband's primary effort was expended in acquiring the original policies. Evidence at trial showed that on a national average, 72% of the existing policies will be automatically renewed after the

first year; 82% will be renewed after the second year; and 88% will be renewed thereafter. The husband nevertheless maintains that he must satisfy certain conditions not present with pension benefits, thus rendering his right to the commissions only a tenuous property interest. Specifically, he refers to the covenant in the agency agreements not to compete and to certain requirements as to renewal volume, the violation or nonattainment of which could result in forfeiture or diminishment of his commissions. He also asserts that uncertainties inherent in renewals, such as customer preferences, economic conditions, and agency turnover, render the renewal commissions too speculative for valuation. While we recognize these concerns, we do not find these conditions so onerous, and the contingencies so uncertain, as to make the contractual right to renewal commissions beyond valuation, particularly when the insurance industry itself assigns a value to them based on statistical persistency rates.

Courts in other jurisdictions have reached like conclusions. One court awarded damages based on the future value of such commissions upon breach of an agency agreement by the insurer and in doing so has found the determined amount to be both predictable and quantifiable. *See Hall v. Farmers Ins. Exchange*, 713 P.2d 1027 (Okl.1985). *Pangburn v. Pangburn*, 152 Ariz. 227, 731 P.2d 122 (App. 1986) held that the renewal value of policies procured by the husband during marriage should be included in the community estate.[3] The husband in *Pangburn* had argued that the renewal commissions were not current assets, but rather a mere expectancy. The court found instead that the renewal value of existing policies, called the "Book of Business," was capable of valuation. The court further determined that this contractual right was earned during

---

3. Although Arizona is a community property state, we previously held in *Deering, supra*, 292 Md. at 123, n. 6, 437 A.2d 883, that the reasoning of courts from community property states is useful in determining what constitutes marital property under the Maryland statute.

the marriage and consequently should be included as a community asset. It concluded that contingencies inherent in the renewals, *i.e.,* the natural attrition rate of the policies and the fact that policyholders might not renew, had been sufficiently accounted for in the expert witness's calculations. Similarly, the California Supreme Court found in *In re Marriage of Skaden,* 19 Cal.3d 679, 139 Cal.Rptr. 615, 566 P.2d 249 (1977) that vested "termination benefits" in an insurance agent's contractual agreement represented a form of deferred compensation for services rendered and thus should be included as community property. In so deciding, the court reasoned that the fact that a vested right is subject to certain conditions within the control of the employee spouse did not justify characterizing the right as an expectancy.

These cases support the view that the claim to renewal commissions is not the type of right that is uniquely personal to the holder, as in a personal injury claim or a professional degree. Instead, it is the type of work-related income encompassing a part of the compensation package developed during the marriage by one of the spouses that each could have justifiably relied upon to provide for their economic future. As such, it is a vested right, a valuable asset not separable from the original policies sold during the marriage, and thus properly a part of the couple's shared assets during marriage. This determination, we think, is consistent with the declared policy of the Marital Property Act, as set forth in the Act's preamble, "that marriage is a union between a man and a woman having equal rights under the law." Plainly, this policy recognizes the nonmonetary contributions made by the wife in this case in accumulating the assets. Finally, in so holding, we note that we must construe the Act liberally to effectuate its broad remedial purpose. *Harper v. Harper, supra,* 294 Md. at 64, 448 A.2d 916.

## IV.

The husband next argues that the advances received by him as a loan from Penn Life should have reduced the

present value of the future commissions in valuing marital property. In support of his position, the husband asserts that he borrowed the money against the profits from the anticipated renewal commissions to finance his agency operation; and that the debt therefore was an encumbrance upon the renewal income to be paid to him in the future. The wife, on the other hand, argues that the husband did not use the advances for the purpose of acquiring renewal commissions but rather for family expenses, including high personal expenditures of his own to support a lavish life style. The wife suggests that the husband's annual income, particularly in the later years of his agency business, was sufficiently high that no need existed to borrow money from Penn Life to meet the expenses of his branch manager operation.

The trial judge made a finding of fact that the loans to the husband were used for family living expenses and that a sufficient nexus had not been established between the debt and the renewal income for it to be considered marital debt. The court determined that the value of the commissions amounted to $410,000. In so concluding, it rejected the expert valuation testimony adduced by the parties, which subtracted the amount of the advances from that of the projected renewal commissions in ascertaining the value of the commissions. The trial judge considered the debt as a nonmarital "economic circumstance" of the husband under § 8–205(a)(3), to be taken into account in determining the amount and the method of payment of the monetary award to the wife. In doing so, the court recognized that no renewal commissions may have been available had the advances not been taken by the husband; nevertheless, it found that "the real use of those monies was not to purchase renewal commissions" but was for family living expenses.

On the record before us, we think the trial judge was wrong. In *Schweizer v. Schweizer*, 301 Md. 626, 484 A.2d 267 (1984), we said:

*"Harper* [*v. Harper,* 294 Md. 54, 448 A.2d 916 (1982)] teaches that a 'marital debt' is a debt which is directly traceable to the acquisition of marital property. Conversely, 'nonmarital debt' is a debt which is not directly traceable to the acquisition of marital property. That part of marital property which is represented by an outstanding marital debt has not been 'acquired' for the purpose of an equitable distribution by way of a monetary award. Therefore, the value of that marital property is adjusted downward by the amount of the marital debt."

In considering the legal effect in the instant matter of the advances drawn by the husband against future commissions, the trial judge seemingly applied the second sentence quoted above without regard to the context in which that sentence was written.

*Schweizer* presented the question, *inter alia,* of whether debt incurred by the husband during the marriage which was not secured by marital property could be used to reduce the value of unencumbered marital property. Specifically, the husband's balance sheet was:

| "Assets: | | $1,436,882 |
|---|---|---|
| Liabilities: | | |
| Secured | $350,000 | |
| Unsecured | 90,000 | 440,000 |
| Net Worth: | | $ 996,882" |

The trial court concluded, using the gross value of assets, that $1,114,700 represented nonmarital property and $332,182 represented marital property. The trial judge in *Schweizer* also concluded that the wife was entitled to a 25% monetary award which he computed to be $80,546 by using the gross value of the marital property without reflecting any of the debt in valuing the marital property.

On appeal before us, the wife in *Schweizer* contended that the trial court had correctly applied the statute. Her position was that the gross value of marital property may be reduced only by debt which specifically encumbers that

property. Because none of the husband's $440,000 debt was secured by marital property, the wife submitted that the husband's total debt was properly reflected only as an economic circumstance at the third stage of the computation when the trial court considers the amount of any monetary award. The husband in *Schweizer*, on the other hand, contended that all of his liabilities should be deducted from marital property, a position which, under the facts in *Schweizer*, would have resulted in a negative valuation of marital property.

We rejected both contentions. The wife's contention was too narrow and the husband's contention was too broad. Relying on the tracing concepts of *Harper*, we said that a debt which could be traced to the acquisition of marital property reduced the value of the marital property and that a debt which could not be so traced did not reduce the value of marital property. We remanded for the trial court to determine what portion, if any, of the husband's indebtedness was "marital debt." We further offered a hypothetical example from the facts in ·*Schweizer* to illustrate the concepts. We assumed that one item of marital property, realty known as "Betty Bush Lane," had a gross value of $150,000 and that the husband was able to trace $100,000 of his debt into the acquisition of Betty Bush Lane. In computing the value of marital property, the $332,182 in gross value of marital property would be reduced by the $100,000 of marital debt to $233,182, which would be subject to a monetary award. The debts of the husband for consideration as an economic circumstance in the amount of any monetary award would be reduced by that $100,000 to $340,000.

 Nothing that we said in *Schweizer* contradicted that part of the wife's contention which recognized that encumbrances on marital property reduce its value. In effect, the value of encumbered marital property is ordinari-

ly the value of its equity.[4]

Indeed, in a holding concerning life insurance, *Schweizer* recognized the rule applicable here:

"In determining the value of the husband's life insurance, which was deemed to be marital property, the court deducted the amount of a loan secured by the cash value of the policy. We note that the [gross] cash value of the insurance was $62,700 and that the loans thereon totaled $46,000 for a net cash value of $16,700. In computing the amount of the marital property, however, the court used a net cash value of only $16,000." 301 Md. at 633–34 n. 2, 484 A.2d 267.

In so holding that the value of the insurance policy as marital property was its net cash value, we were not concerned with whether the premiums by which the gross cash values in the policy had been acquired were paid from marital or nonmarital property. Nor were we concerned there with how the proceeds of the loans were applied. *Schweizer* was concerned with tracing the source of funds for the acquisition of the marital property involved there because that property was unencumbered but arguably had been acquired by debt incurred by the husband.

In the instant matter the advances drawn by Mr. Niroo against future insurance commissions are repayable on demand. If called, the debt can be set off by Penn Life against future commissions. The debt, in economic effect, is an encumbrance on the future commissions which reduces their present value. The trial judge therefore erred in not subtracting the debt of $267,000 from the value of the renewal income.

## V.

As a final matter, the husband maintains that the trial judge abused his discretion in determining the amount of

---

4. Neither *Schweizer* nor the instant matter presents the problem of an encumbrance placed on marital property to avoid equitable distribution. *Cf. Sharp v. Sharp,* 58 Md.App. 386, 473 A.2d 499 (1984).

the monetary award by not properly considering substantial nonmarital debts incurred by him during the marriage. As the case must be remanded for further consideration in determining the proper monetary award to the wife, it would serve no purpose to now pass upon the effect of the husband's nonmarital debts in the ultimate calculation. Suffice it to note that in making this new determination, the court must, as it did, consider, *inter alia*, "the economic circumstances of each party at the time the award is to be made." § 8–205(a)(3). In making this assessment, the trial judge will consider not only the $267,000 debt owed by the husband to Penn Life now determined to be a marital debt, but also the husband's other "substantial debts on credit cards and mortgages." In making the monetary award, the court may order that it be paid over a designated period of time.[5] The court may also reconsider the amount of the wife's alimony in light of our decision that the $267,000 debt is marital debt, offsetting the value of the commissions as a marital asset. The trial judge is, of course, empowered upon remand to make any adjustments he feels necessary to arrive at a fair and equitable distribution of the marital assets.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–FOURTH BY THE WIFE AND THREE–FOURTHS BY THE HUSBAND.

---

**5.** Although the husband contends that an "as, if and when" payment schedule would be more equitable, *i.e.*, awarding Mrs. Niroo part of the renewal commissions only as they mature, we agree with the California Supreme Court in *In re Marriage of Skaden, supra,* 139 Cal.Rptr. at 619–20, 566 P.2d at 253–54, that this solution would require additional judicial supervision and potential delay.