673 A.2d 732

**James A. SKRABAK**

v.

**Gwendolyn M. SKRABAK.**

**No. 674, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

March 28, 1996.

634

Arnold M. Weiner (Bruce L. Mann and Weiner, Astrachan, Hillman, Gunst & Allen, P.C., on the brief), Baltimore, for Appellant.

Donald E. Beachley (Miller, Oliver, Beachley & Stone, on the brief), Hagerstown, for Appellee.

Argued before HARRELL and SALMON, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

SALMON, Judge.

On November 30, 1994, the Circuit Court for Washington County granted Gwendolyn Skrabak, appellee, an absolute divorce from James Skrabak, appellant. The divorce judgment provided her with a monetary award of $210,000, an award from an individual retirement account of $82,000, and indefinite alimony in the amount of $3,250 per month. Dr. Skrabak, appellant, filed a Motion to Alter or Amend Judgment on December 12, 1994, which the trial court denied. This timely appeal followed, in which appellant presents six questions for our resolution. We have rephrased those questions as follows:

I. Did the trial court err in allowing appellee's expert to utilize the "excess earnings" method to determine the value of appellant's business?

II. Did the trial court err in its determination of the value of institutional goodwill in appellant's business?

III. Did the trial court err by including appellant's business accounts receivable in both valuing marital property and determining amount of alimony?

IV. Did the trial court err in its application of Md.Code (1984, 1991 Repl.Vol.), § 8–205(b) of the Family Law Article ("FL")?

V. Did the trial court err by awarding post-judgment interest on amounts of the property settlement that were not presently due and payable?

VI. Should the trial court's alimony award be vacated?

For the reasons set forth below, we shall vacate the monetary and alimony awards.

### FACTS

Appellant and appellee married on May 22, 1976 in Morgantown, West Virginia. At that time, appellant was a graduate student studying biology at West Virginia University; appellee was a waitress. Appellant decided to go to medical school instead of finishing his graduate program. He began in January 1979 in Grenada, transferring to the West Virginia School of Osteopathic Medicine in August 1979. Internships took appellant to Pennsylvania, Georgia, and Michigan. In 1983, Mrs. Skrabak enrolled in and later completed a nursing program in Michigan, becoming a certified licensed practical nurse.

Dr. Skrabak graduated from medical school in 1986 with a specialization in anesthesiology and took a position in Hagerstown, Maryland, with Joseph Wilson, M.D. In 1989, Dr. Wilson offered Dr. Skrabak a partnership, which he accepted. In July 1991, however, Dr. Skrabak went into practice for himself.

During the family's summer vacation in 1991, Dr. Skrabak talked with his wife about separating. The marriage had suffered from a variety of problems from its inception, none of which are relevant here. Dr. Skrabak left the family home on October 7, 1991. Mrs. Skrabak filed for divorce in October 1992 on the grounds of adultery and voluntary separation.

Appellee had a child from a prior relationship, Heath, who was adopted by appellant at some point during the marriage. Dr. and Mrs. Skrabak had three children together: James

Nathan, born January 16, 1979; Rebecca Ann, born July 1, 1980; and Jonathan Paul, born August 28, 1981.

Dr. Skrabak began a relationship with a 20–year–old in August of 1991, which developed into a sexual relationship in September or October of that year. After that ended, he began a relationship with a 19–year–old and, about a year later, broke that off and entered a relationship with another 19–year–old, Amy Newcomer. At the time of the trial, he was living with Ms. Newcomer and his son, James Nathan.

In December 1992, Dr. Skrabak was approached by three certified registered nurse anesthetists ("CRNAs"), who asked whether he was interested in retaining their services as full-time employees. Dr. Skrabak agreed to hire them and entered into oral contracts with each. He later hired a fourth fulltime CRNA. He incorporated his sole proprietorship and began practicing as James A. Skrabak, D.O., P.A., on January 1, 1993.

Trial testimony focused on Dr. Skrabak's anesthesiology practice. A parade of witnesses testified that the surgeons at Washington County Hospital viewed appellant with high professional regard. There was testimony that cases are referred to anesthesiologists by the surgeons, most of whom prefer one or another based on personal rapport or professional reputation. Three of the surgeons at the hospital referred all or most of their cases to Dr. Skrabak. There was also testimony that several surgeons preferred to refer their cases at random to the various anesthesiologists in the area. Two witnesses testified that appellant was called upon to perform the anesthesia in many of the most difficult cases at the hospital. Finally, there was testimony that hospital staff frequently recommended him to their own families.

Each party called a certified public accountant to testify as an expert in valuing Dr. Skrabak's practice. Appellee's expert, Michael Flurie, testified that the corporation was worth $745,000, with tangible assets valued at $480,354 and institutional goodwill valued at $264,646. Mr. Flurie testified that Dr. Skrabak had said in his deposition and in a personal

interview that cases were all assigned on a rotating basis and this fact contributed significantly to his opinion that the goodwill in the corporation was institutional.

Appellant's expert, D. Scott Beck, testified that Dr. Skrabak's practice was valued at $416,149, all of which was tangible assets · (shareholder's equity plus accounts receivable). He then deducted the state and federal income taxes Dr. Skrabak would have to pay were he to sell his practice, yielding a net tangible asset value of $306,214. Mr. Beck testified that there was no goodwill value in the corporation, stating, "when any doctor can walk into the hospital and set up their practice, why would someone pay a premium for Dr. Skrabak's practice?"

Appellee's expert, Mr. Flurie, testified on rebuttal that, because cases were not assigned on a rotational basis as he had previously been told, the percentage of institutional goodwill as he had previously calculated it was incorrect. He testified that, because there were five professionals in the practice, Dr. Skrabak and four CRNAs, 20 percent of the goodwill in the corporation, or $50,000,[1] was personal to Dr. Skrabak. He testified that, therefore, the corporation should be valued at $695,000.

The trial judge granted Mrs. Skrabak an absolute divorce based on Dr. Skrabak's adultery. In a carefully written Memorandum Opinion, he discussed the monetary award. The trial court determined that the total value of the parties'· marital property was $987,825. Mrs. Skrabak was awarded $82,000 from Dr. Skrabak's individual retirement account, in addition to a monetary award of $210,000. Dr. Skrabak was directed to pay Mrs. Skrabak $50,000 from the proceeds of the sale of the family home. The balance of $160,000 was to be paid in yearly installments of $20,000, "until the entire monetary award, plus any accumulated interest, is paid in full." Mrs. Skrabak also received a car valued at $8,375; half of the

---

1. Twenty percent of $264,646 is actually $52,929. Mr. Flurie apparently rounded his numbers down when he ascribed $50,000 of goodwill to Dr. Skrabak and $214,646 to the practice as a whole.

couple's federal and state income tax refund, a value of $5,105.50; and the funds in her checking account, $830.

The trial judge also determined that the parties' respective incomes would be unconscionably disparate and awarded Mrs. Skrabak indefinite alimony in the amount of $3,250 per month. Finally, Dr. Skrabak was directed to pay child support for the two children who remained living with Mrs. Skrabak.

## *DISCUSSION*

**I. Did the trial court err in allowing appellee's expert to utilize the "excess earnings" method to determine the value of appellant's business?**

Appellant contends that this Court has criticized the use of the "excess earnings" method to value goodwill in a professional practice for purposes of determining a monetary award in a divorce case and that, therefore, that method may not be used in Maryland courts.

The traditional definition of goodwill is " 'the probability that the old customers will resort to the old place.' " *Brown v. Benzinger*, 118 Md. 29, 35, 84 A. 79 (1912) (quoting *Crutwell v. Lye*, 34 Eng.Rep. 129, 134 (ch. 1810)). It is an intangible asset that adds value to a business entity.[2] This

---

**2.** It is an indisputable economic fact that when businesses are bought and sold on the open market, the negotiated sale price is often greater than the total value of the tangible assets of the business involved. This difference is due to the fact that the income of a business depends upon many factors other than its assets. When these factors increase the income of a business under one owner, they are likely to cause a similar increase in the earnings of the business after it is sold. Because of this *transferable* likelihood of increased future earnings, those who buy businesses on the open market are sometimes willing to pay more for a business than the total of its tangible assets. This additional element of value is called *good will.* Brett R. Turner, Equitable Distribution of Property § 6.22, at 421 (2d ed. 1994). This likelihood of increased future earnings is expressed in "general public patronage and encouragement [of a business], which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." J. Story, Commentaries

Court has held that goodwill is a legally protected property right and that "the goodwill of a spouse's business is to be valued and equitably divided pursuant to the three step marital property analysis." [3] *Strauss v. Strauss*, 101 Md.App. 490, 502, 647 A.2d 818 (1994), *cert. denied*, 337 Md. 90, 651 A.2d 855 (1995).

The excess earnings method is "[p]erhaps the most common method for valuing goodwill." BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 7.07, at 533 (2d ed. 1994). "Under this method, the court first computes the difference between the actual earnings of the business and the earnings of the 'average' or 'reasonable' business. This difference is then 'capitalized,' or multiplied by some number (the *factor*) between one and five." *Id.* The goodwill value is then added to the value of the sum total of the tangible assets to reach the total value of a particular business. *Id.*

Three decisions by this Court have discussed the excess earnings method as a way to value goodwill. In *Prahinski v. Prahinski*, 75 Md.App. 113, 540 A.2d 833 (1988), *aff'd*, 321 Md. 227, 582 A.2d 784 (1990), we stated in dicta:

When only a capitalization of excess earnings method of evaluation is applied to a professional practice, the value

---

on the Law of Partnership as a Branch of Commercial and Maritime Jurisprudence § 99, at 139 (Boston 1841), *quoted in Prahinski v. Prahinski*, 75 Md.App. 113, 126, 540 A.2d 833 (1988), *aff'd*, 321 Md. 227, 582 A.2d 784 (1990).

" '[A] professional can transport all of his skill (earning capacity) to a new town, but patients or clients, reputation and referrals (goodwill) cannot always be transported.' " *Hollander v. Hollander*, 89 Md.App. 156, 169, 597 A.2d 1012 (1991) (quoting *In re Marriage of Hall*, 103 Wash.2d 236, 692 P.2d 175, 178 (1984)).

**3.** Maryland law requires the application of a three-step analysis when calculating a monetary award in the course of a divorce proceeding. First, the trial court must characterize all property owned by the parties as either marital or non-marital. FL § 8–203. Second, the court must determine the value of all marital property. FL § 8–204. Finally, the court may make a monetary award as an adjustment of the parties' equities and rights in the marital property. FL § 8–205(a). *See Strauss, supra*, 101 Md.App. at 501, 647 A.2d 818.

determined, characterized as "professional goodwill," represents nothing more than an entity's future earning capacity; it is not necessarily an asset that may be sold, transferred, or assigned.... The capitalization of excess earnings approach, therefore, according to Professor Parkman, *The Treatment of Professional Goodwill in Divorce Proceedings,* 18 Fam.L.Q. 213 (1984), does nothing more than place "a value on an individual's reputation, which is something possessed by everyone."

*Id.* at 132, 540 A.2d 833 (citations omitted).

In *Hollander v. Hollander,* 89 Md.App. 156, 597 A.2d 1012 (1991), this Court, again in dicta, expounded on its view of the excess earnings method:

Because the issue has not been preserved, we do not determine the correctness of utilizing a capitalization of excess earnings method of valuating a dental business. We note, however, the approach of Delaware, Missouri, Utah, and Wisconsin in rejecting the consideration of future earning capacity as a sole measure of goodwill....

*Id.* at 174 n. 8, 597 A.2d 1012.

Finally, this Court stated, also in dicta, in *Strauss, supra,*

Although we refrained [in *Hollander*] from delving into the details of the trial court's methodology used to create a goodwill value, we did provide some guidance for future cases. First, we distinguished goodwill from future earnings capacity.... To this end, we discouraged one common analysis used to measure goodwill, the excess earnings method, because the value arrived at under this calculation "represents nothing more than an entity's future earning capacity."

*Id.* at 505 n. 3, 647 A.2d 818.

Thus, this Court has never stated that the capitalization of excess earnings method is completely inappropriate for use in

Maryland courts. We have merely stated that we discourage its use as the sole method to value goodwill.[4]

Appellee's expert did not solely use the capitalization of excess earnings method in arriving at his valuation of the anesthesiology practice's goodwill. Mr. Flurie testified that he used two methods to determine the total value of Dr. Skrabak's anesthesiology practice. He first determined the value of the practice's tangible assets by adding shareholder's equity to the accounts receivable (discounted by 69 percent for uncollectability). Next, he determined the value of the goodwill of Dr. Skrabak's practice using the "excess earnings method." Mr. Flurie stated that he then weighed the tangible assets value by 30 percent and the excess earnings value by 70 percent in order to arrive at a "blended value" of $745,000. Because Mr. Flurie did not rely solely on the capitalization of excess earnings method to value goodwill, appellant's argument fails.[5]

---

**4.** The capitalization of excess earnings approach does not appear to have much utility in this case. There have been no sales of a similar practice in the area in the past 20 years. Also, there is no indication that anyone would pay $264,646 above the value of the accounts receivable held by the corporation when the person could simply start his own practice, as Dr. Skrabak did. It might be of some utility in a case where there are several anesthesiologists in practice together, as opposed to just one; there is a record of similar practices being bought and sold in the same area; and the market is not as small as that in Washington County.

**5.** The primary argument against the use of the capitalization of excess earnings method is that it measures future earnings, thereby double counting earning capacity as both a marital asset subject to equitable distribution in a monetary award and income from which alimony may be paid. This argument has been criticized in several arenas. "All the factors making up the formula components involve historical earnings and assets data. Past earning and assets are used to compute present goodwill." Joseph R. Wall, Comment, *The Recognition and Valuation of Professional Goodwill in the Marital Estate*, 66 Marq.L.Rev. 697, 718 (1983).

A small number of decisions have attacked the excess earnings method on grounds that it divides the future earnings of the owning spouse. This criticism is entirely unjustified.... The fundamental assumption of the method is that by looking only at earnings above the average salary of similar persons in the same field, the court can focus narrowly upon that segment of future earnings which is actually attributable to previously existing good will. A court which uses

## II. Did the trial court err in its determination of the value of institutional goodwill in appellant's business?

■ Appellant argues that any goodwill in James A. Skrabak, D.O., P.A., was based on Dr. Skrabak's personal reputa-

the excess earnings method is therefore no more dividing future earnings than is a court which divides a pension. In both instances, the court is treating future benefits as marital property because they were earned during the marriage.

Turner, *supra*, § 7.07 at 534. *See also* Alan S. Zipp, *Divorce Valuation of Business Interests: A Capitalization of Earnings Approach*, 23 Fam. L.Q. 89, 100–01 (1989) (arguing that capitalization of excess earnings is best approach to valuing business interests upon divorce).

Many states have expressly approved capitalization of excess earnings as an appropriate method by which to value goodwill. *See Mueller v. Mueller*, 144 Cal.App.2d 245, 301 P.2d 90 (1956); *In re Marriage of Huff*, 834 P.2d 244, 255–56 (Colo.1992) (en banc); *Eslami v. Eslami*, 218 Conn. 801, 591 A.2d 411. 419 (1991); *Olsen v. Olsen*, 125 Idaho 603, 873 P.2d 857, 860 (1994); *Clark v. Clark*, 782 S.W.2d 56, 60 (Ky.Ct.App.1990); *In re Marriage of Hull*, 219 Mont. 480, 712 P.2d 1317, 1322 (1986); *Dugan v. Dugan*, 92 N.J. 423, 457 A.2d 1, 9–10 (1983); *Hertz v. Hertz*, 99 N.M. 320, 657 P.2d 1169, 1174 (1983); *White v. White*, 204 A.D.2d 825, 611 N.Y.S.2d 951, 953, *appeal dismissed*, 84 N.Y.2d 977, 622 N.Y.S.2d 916, 647 N.E.2d 122 (1994); *Poore v. Poore*, 75 N.C.App. 414, 331 S.E.2d 266, 271–72, *review denied*, 314 N.C. 543, 335 S.E.2d 316 (1985), *cited with approval in McLean v. McLean*, 323 N.C. 543, 374 S.E.2d 376, 385 (1988); *In re Marriage of Hall*, 103 Wash.2d 236, 692 P.2d 175, 180 (1984) (en banc); *Sharon v. Sharon*, 178 Wis.2d 481, 504 N.W.2d 415, 419 (1993).

Only a few states have rejected the use of the capitalization of excess earnings method of valuing goodwill. *See Mitchell v. Mitchell*, 152 Ariz. 317, 732 P.2d 208, 214 (1987) (en banc); *E.E.C. v. E.J.C.*, 457 A.2d 688, 694 (Del.1983); *Mocnik v. Mocnik*, 838 P.2d 500, 505 (Okla.1992).

Other states have discussed the method without making a definite statement as to whether it should not be used in all cases. *See Thompson v. Thompson*, 576 So.2d 267, 270 (Fla.1991) (exclusive method for valuing businesses is fair market value, what willing buyer would pay); *Rogers v. Rogers*, 296 N.W.2d 849, 853 (Minn.1980) (capitalization of excess earnings disapproved when formula based on husband's continued presence); *Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851, 857–59 (1986) ("we do not reject in all cases capitalization of excess earnings as a method to determine earning capacity"). In *Hanson v. Hanson*, 738 S.W.2d 429, 436 (Mo.1987) (en banc), the Missouri Supreme Court expressed its strong preference for the fair market value method and rejected use of capitalization formula because it places present value on future earnings. In *In re Marriage of Brooks*, 742 S.W.2d 585, 589 (Mo.Ct.App.1987), the intermediate appellate court, taking into account *Hanson*, allowed the use of the capitalization of excess earnings method, which is a "method approved by accountants and accepted, for the most part, by the courts."

tion and, therefore, was not property subject to equitable distribution. Appellant contends that there was no evidence upon which appellee's expert could base his opinion that 80 percent of the goodwill in appellant's anesthesiology practice was institutional, that is, "true" goodwill. Appellant also argues that the trial judge's determination that 50 percent of the goodwill had nothing to do with appellant's reputation was equally groundless.

A spouse is "entitled to have *true* goodwill, as distinguished from future earnings, considered as any other property acquired during the marriage." *Prahinski, supra,* 75 Md. App. at 130, 540 A.2d 833.[6] In order for the business's goodwill to be considered marital property, "it must be an asset having a separate value from the reputation of the practitioner." *Prahinski v. Prahinski,* 321 Md. 227, 239, 582 A.2d 784 (1990).

In determining the value of a business's goodwill for the purpose of an equitable distribution of assets upon divorce, a court "should ascertain first, whether in the particular case there exists a personal component, and secondly, if it does exist, determine the value of the personal component in the initial computation so that it can subsequently be excluded from the total valuation for purposes of fashioning an appropriate award." *Strauss, supra,* 101 Md.App. at 507, 647 A.2d 818.

---

**6.** This Court stated the difference thusly:

(1) Where goodwill is a marketable business asset distinct from the personal reputation of a particular individual, as is usually the case with many commercial enterprises, that goodwill has an immediately discernible value as an asset of the business and may be identified as an amount reflected in a sale or transfer of a business.

(2) If the goodwill depends on the continued presence of a particular individual, such good will, by definition, is not a marketable asset distinct from the individual.

*Prahinski, supra,* 75 Md.App. at 133–34, 540 A.2d 833.

Using this analysis, appellant's expert, Mr. Beck, testified that the corporation had no goodwill apart from Dr. Skrabak's personal reputation. Appellee's expert, Mr. Flurie, testified that any goodwill in the anesthesiology practice was institutional, that is, not dependent on Dr. Skrabak's reputation. On rebuttal, Mr. Flurie revised his opinion to state that, because there were five professionals in the practice, "in considering how much professional goodwill for Dr. Skrabak there would be, I considered one-fifth or 20 percent to be appropriate."

The testimony at trial showed that most cases are referred to anesthesiologists by surgeons. Dr. Skrabak apparently had an excellent reputation as an anesthesiologist. At least three surgeons at Washington County Hospital referred all or most of their cases to Dr. Skrabak. Several surgeons would distribute their referrals on a random or evenly divided basis, giving the next case to whomever was next in line. Other surgeons would request Dr. Skrabak for their most complicated cases. Finally, there was testimony that some staff members at the hospital recommended that their families and friends request Dr. Skrabak. In sum, there was plenty of evidence to show that at least some of the goodwill held by his practice was based on Dr. Skrabak's personal reputation. The problem lies in determining how much.

Mr. Flurie testified that his valuation of the practice's goodwill was based on an assumption that Dr. Skrabak would continue in the practice with the new anesthesiologist for a year in order to introduce him to the surgeons. In fact, Mr. Flurie's testimony indicates that he felt Dr. Skrabak would be required to stay on after a sale "if he wants to . . . get top value." This testimony contradicts the notion that any goodwill was institutional. *See Prahinski, supra,* 75 Md.App. at 134, 540 A.2d 833 (stating that goodwill is based on personal reputation if it depends on the continued presence of a particular individual). Further, Mr. Flurie's original opinion that all goodwill was institutional was based on the fact that Dr. Skrabak had told him he got his referrals on a purely rotational basis. Mr. Flurie assumed that, were Dr. Skrabak to leave,

the corporation would continue to receive a fair number of cases. This is the converse of goodwill.

Appellant's expert testified that no institutional goodwill was generated by the CRNAs employed by Dr. Skrabak. These anesthesiology nurses actually administer the anesthesia, although an anesthesiologist must be available in the hospital to supervise them. The four CRNAs were not under written contracts and, therefore, Dr. Skrabak could not guarantee that they would remain if he sold his practice. There was testimony that at least one surgeon who referred all of his cases to Dr. Skrabak would not continue to do so if another anesthesiologist took over the business.

" '[A]n expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant.' " *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 741, 625 A.2d 1005 (1993) (quoting *Surkovich v. Doub,* 258 Md. 263, 272, 265 A.2d 447 (1970)). The facts upon which the expert bases his opinion must elevate that opinion " 'above the realm of conjecture and speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown.' " *Id.* (quoting *State Dep't of Health v. Walker,* 238 Md. 512, 520, 209 A.2d 555 (1965)). This Court's job on appeal "is not to re-weigh expert testimony, but to assure that there is an adequate foundation for the opinion rendered below." *Strauss, supra,* 101 Md.App. at 506, 647 A.2d 818. In this case, Mr. Flurie's opinion as to the worth of institutional goodwill had no value because the facts upon which it was based simply do not support his opinion. We see no soundness of reason for Mr. Flurie to divide the value of the practice's goodwill equally between the five "professionals." There is no logical basis, other than guesswork and speculation, to give the four CRNAs an equal amount of goodwill as that held by the doctor who employs and supervises them. Further, there is no connection between the value given Dr. Skrabak's practice and what a real person seeking to enter this field would pay. Why pay more for goodwill if any practice will be assigned a significant number of cases on a

rotational basis and if there is no guarantee the four admittedly excellent CRNAs will stay?

Appellee's expert testified that he weighed the value he had calculated using the tangible assets method by 30 percent and the value he had calculated using the capitalization of excess earnings method by 70 percent, and "blended" these numbers to come up with his opinion. He testified that

the net asset value is the bottom line figure, that's the lowest that it would be. And I feel that the excess earnings value is more indicative but I don't want to give a hundred percent weight to that; so I weighted those two results, 30 percent for the net asset value and 70 percent for the excess earnings value.

If there is a basis for choosing those weights, it was not shown on this record.

Generally, the value of a corporation is determined by placing a value on each of the component assets of the business and adding the numbers together. TURNER, *supra,* § 7.07. Those assets "fall into three classes: tangible assets, liabilities, and goodwill." *Id.* Mr. Flurie's "blending" of numbers that measure two different types of assets, tangible and intangible, flies against reason.

■ "[T]he trial judge need not accept the testimony of any expert." *Quinn v. Quinn,* 83 Md.App. 460, 470, 575 A.2d 764 (1990). The trial judge in this case did not accept either expert witness's opinion as to what amount of goodwill was attributable to Dr. Skrabak personally. Instead, the trial judge found that 50 percent of the goodwill in the practice was based on Dr. Skrabak's personal reputation, valuing the practice at $612,677. The court stated in its Memorandum Opinion:

It is uncontradicted that the defendant has a good reputation at the hospital and is viewed by some physicians as the most competent practitioner to handle difficult procedures. However, the fact that his CRNAs also enjoy an excellent reputation in the medical community cannot be disputed.... Because of the reputation of his CRNAs, the

defendant's industrious office staff, as well as the apparent ability of the Corporation, excluding the defendant, to operate smoothly, efficiently and satisfy the needs of various surgeons and patients, the Court must conclude that organizational goodwill exists.

. . . .

... The Court has been convinced that the Corporation would continue to be assigned a significant number of cases on a rotation basis regardless of the defendant's reputation. The Court finds that the CRNAs would remain with the Corporation with its internal smooth running structure under the supervision of an interested, competent anesthesiologist. Therefore, the Corporation will continue to earn income and thereby have value exclusive of the defendant's participation.

. . . .

... [I]nstitutional goodwill consists of 50% of the total intangible asset. This seems appropriate additionally because Mr. Flurie noted in his testimony that he assumed the defendant would continue with the Corporation even after it was transferred.

In non-jury cases, this Court must assume the truth of all evidence tending to support the findings of the trial court, and may simply inquire "whether there is any evidence legally sufficient to support those findings." *Weisman v. Connors*, 76 Md.App. 488, 500, 547 A.2d 636 (1988). We can find no evidence in the record to support the trial judge's conclusion that 50 percent of the goodwill held by appellant's practice was institutional and, therefore, marital property. The trial judge apparently attempted to correct Mr. Flurie's improperly founded opinion and just as arbitrarily made up a number. This was clearly erroneous. *See In re Marriage of Sedlock*, 69 Wash.App. 484, 849 P.2d 1243, 1250 (1993) (reversing and remanding trial judge's apportionment of goodwill as coming "out of thin air").

If appellee can produce an expert on remand who has an adequate evidentiary basis for an opinion as to the percentage

of goodwill value attributable to the corporation itself as opposed to Dr. Skrabak's personal reputation, the trial judge may consider the testimony. Otherwise, he may not.

### III. Did the trial court err by including appellant's business accounts receivable in both valuing marital property and determining amount of alimony?

Appellant argues that the accounts receivable in his corporation represent his future stream of income, which should only be counted toward determining the amount of alimony and child support he is able to pay. Appellant contends that the trial judge erred by looking at the accounts receivable in determining the value of his corporation, which was used to determine what monetary award was appropriate.

The short answer to this argument is that appellant put an expert witness on the stand at trial, Mr. Beck, who used the accounts receivable himself to form the basis of his opinion of the value of Dr. Skrabak's corporation. The doctrine of estoppel by admission bars such an argument. *See Van Royen v. Lacey*, 266 Md. 649, 651–52, 296 A.2d 426 (1972) (quoting *Cave v. Mills*, 7 H. & W. 927 (Court of Exchequer) ("A man shall not be allowed to blow hot and cold, to claim at one time and deny at another.")).

Even if the argument was not barred, it is without merit. Appellant points to five states that have allegedly held that accounts receivable cannot be part of the valuation of the marital assets and the determination of alimony. A close reading of the cases cited by appellant, and subsequent cases in those jurisdictions, convinces us that they do not clearly support appellant's contention that using accounts receivable to value a corporation constitutes double-dipping.[7]

---

7. *See McClennen v. McClennen*, 11 Ariz.App. 395, 464 P.2d 982, 984 (1970) (stating, in dicta, that it would be improper to divide accounts receivable between spouses because "accounts receivable represents what he lives on from month to month. It is his source of income and the source of the alimony and child support payments ordered by the trial court."), *criticized in In re Marriage of Goldstein*, 120 Ariz. 23, 583

A Maryland case, however, does support, by analogy at least, our holding that using accounts receivable to value a corporation is not error. In *Riley v. Riley*, 82 Md.App. 400, 571 A.2d 1261, *cert. denied*, 320 Md. 222, 577 A.2d 50 (1990), the husband argued that his pension should not be considered a source of income in determining alimony because the wife had already been awarded a share of it as part of her monetary award. *Id.* at 405, 571 A.2d 1261. The Court stated:

> if the court removes an asset or source of income from the payor spouse through a monetary award (or otherwise), it cannot premise an alimony award on the assumption that that asset or source of income is still available to the payor. But we see no reason why it cannot base such an award on assets or sources of income that have *not* been taken from the payor and that do remain available. That does not constitute double dipping. . . .

------

P.2d 1343, 1344 (1978) (holding that accounts receivable are properly considered in valuing marital assets; does not mention alimony); *Leone v. Leone*, 577 So.2d 587 (Fla.Dis.Ct.App.1990) (holding that trial court did not abuse discretion in denying wife equitable interest in husband's business accounts receivable, which he, by agreement with the business, received one-half of as income, from which he was required to make support payments), *narrowly construed by Staman v. Staman*, 622 So.2d 1147 (Fla.Dis.Ct.App.1993) (holding that trial court erred in concluding that, as matter of law, accounts receivable cannot be included in valuation of marital assets; does not mention alimony); *In re Marriage of Tietz*, 238 Ill.App.3d 965, 178 Ill.Dec. 876, 885, 605 N.E.2d 670, 679 (1992) (holding that accounts receivable are assets already earned but not yet collected so there was no double counting when they are used to value the tangible assets of a law practice); *Sorensen v. Sorensen*, 839 P.2d 774, 777–78 (Utah 1992) (disavowing any implication in *Dogu v. Dogu*, 652 P.2d 1308 (Utah 1982), that accounts receivable cannot be valued and counted as an asset, even though the proceeds may be used to pay alimony); *Hubert v. Hubert*, 159 Wis.2d 803, 465 N.W.2d 252, 255 (App.1990) (stating that considering accounts receivable to value corporation as part of assets subject to property division and as anticipated income in determining amounts of child support and alimony is improper double dipping); *but see Sharon v. Sharon*, 178 Wis.2d 481, 504 N.W.2d 415, 421 (App.1993) (stating that trial court may in its discretion choose to exclude the accounts receivable from the marital estate if the evidence indicates that there is a link between the receivables and salary).

*Id.* at 406–07, 571 A.2d 1261. The Court held that the husband's pension benefit had not been double counted because the wife had already received her share of the pension. The husband's monthly pension benefit was based on what was left in the pension fund. He retained entitlement to the full monthly pension benefit. The amount he had paid his wife from the pension fund was no longer a resource of his and was not counted as such. *See id.* at 407 & n. 1, 571 A.2d 1261.

In this case, the accounts receivable used to value the corporation were not removed as assets held by the payor spouse, Dr. Skrabak, who will continue to own and have access to them. They were not awarded directly to Mrs. Skrabak. The accounts receivable held by the corporation at the time of the trial were fees that had already been earned and can be called "future income" only in the sense that they will be collected in the future. *See In re Marriage of Tietz,* 238 Ill.App.3d 965, 178 Ill.Dec. 876, 605 N.E.2d 670 (1992); *accord Niroo v. Niroo,* 313 Md. 226, 237, 545 A.2d 35 (1988) (holding that renewal commissions on insurance policies, which are collected in the future, were earned during the marriage and are considered marital property). The accounts receivable that can properly be considered "future income," in the sense that Dr. Skrabak uses the term, are those that his corporation has been earning since the dissolution of the marriage, and those that it has not yet earned. Because the accounts receivable were not divided between the spouses, and because they create a constant cash flow that continually reimburses the corporation, there was no double counting of assets in this case.

**IV. Did the trial court err in its application of Md.Code (1984, 1991 Repl.Vol.), § 8–205(b) of the Family Law Article ("FL")?**

Appellant contends that the trial court committed three errors in its application of FL § 8–205(b): [8] the trial

---

8. Section 8–205 of the Family Law Article gives the court the power to grant a monetary award "as an adjustment of the equities and rights of

court did not give proper weight to the fact that Dr. Skrabak's practice was incorporated and a pension plan was opened after the parties separated; the trial court erred by failing to discount the value of the accounts receivable by the amount of income taxes that Dr. Skrabak would have to pay on them; the trial court improperly considered irrelevant evidence in making an adjustment of the equities.

A trial judge must consider each factor listed in FL § 8–205(b) when determining the amount of the monetary award. *See, e.g., Jandorf v. Jandorf,* 100 Md.App. 429, 641 A.2d 971 (1994). The weight given each factor is left to the discretion of the trial court. *See, e.g., Lemley v. Lemley,* 102 Md.App. 266, 649 A.2d 1119 (1994). The eighth factor, relat-

---

the parties concerning marital property." FL § 8–205(a). The statute further provides:

The court shall determine the amount and the method of payment of a monetary award . . . after considering each of the following factors:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the. circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) *how and when specific marital property* or interest in the pension, retirement, profit sharing, or deferred compensation plan, *was acquired, including the effort expended by each party in accumulating the marital property* or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both;

(9) the contribution by either party of property described in § 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) *any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award* or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both. ·

FL § 8–205(b) (emphasis added).

ing to how and when specific marital property [9] was acquired and the contribution that each party made toward its acquisition, however, should be "given considerable weight." *Alston v. Alston,* 331 Md. 496, 507, 629 A.2d 70 (1993).

In *Alston,* the husband purchased a winning Lotto ticket with an annuity value of over one million dollars after he and his wife separated, but before they were divorced. *Id.* at 501, 629 A.2d 70. The Court of Appeals held that the trial judge erred by giving *equal* weight to the fact that the wife had made no contribution to acquisition of the ticket. The Court stated:

> While no hard and fast rule can be laid down, and while each case must depend upon its own circumstances to insure that equity be accomplished, generally in a case such as this the eighth factor should be given greater weight than the others. Where one party, wholly through his or her own efforts, and without any direct or indirect contribution by the other, acquires a specific item of marital property after the parties have separated and after the marital family has, as a practical matter, ceased to exist, a monetary award representing an equal division of that particular property would not ordinarily be consonant with the history and purpose of the statute.

*Id.* at 507, 629 A.2d 70. Because buying the Lotto ticket "was not dependant in any way on the parties' joint efforts or shared life, past or present," the Court held that an award of part of the annuity value to the wife was in error. *Id.* at 508, 509, 629 A.2d 70 ("the record before us contains no evidence which would justify awarding any portion of the annuity to Mrs. Alston.").

The trial judge in this case, however, did give considerable weight to this factor.

> It is uncontradicted that a $23,240.00 Purchase Money Pension Plan was acquired during the course of the mar-

---

**9.** Marital property is "property, however titled, acquired by one or both parties during the marriage." FL § 8–201(e)(1).

riage, but after the separation. Dr. Skrabak's Corporation was established . . . after cohabitation ceased. Of course, the Court will note its consideration of those facts, as well as the fact that the defendant's sole effort after separation caused the aforementioned items of property to accrue. The plaintiff did not expend any effort in order to procure those items.

*Alston* does not state that property acquired after separation should be taken out of the marital property pool, only that the timing of acquisition must be considered. The trial judge did that in this case.

Dr. and Mrs. Skrabak had $987,825 of marital property. Mrs. Skrabak's monetary award of $292,000 [10] is not grossly disproportionate, it is not an equal division of the after-acquired property, and it does not indicate that the trial judge did not give considerable weight to FL § 8–205(b)(8).[11] Further, there is no evidence that the trial judge awarded part of the after-acquired pension plan to Mrs. Skrabak. The trial judge specifically directed that $82,000 be given to Mrs. Skrabak from an IRA account, not the pension plan.[12]

---

**10.** Mrs. Skrabak received $210,000 and an additional $82,000 from an IRA account.

**11.** If we did not include Dr. Skrabak's practice and the pension fund in the amount available for a monetary award, we would come up with $351,908 available for distribution to adjust the equities. From this, we must subtract the value of items Mrs. Skrabak was allowed to keep:

| | |
|---|---|
| $8,375.00 | car |
| 5,105.50 | income tax refund |
| 830.00 | checking account |

Therefore, $337,588.50 would be available for distribution to adjust the equities. If the trial judge had totally discounted the so-called "after-acquired" property, a 50–50 split would give Mrs. Skrabak a monetary award of $168,794.25. We note, however, that we see no reason to discount totally the medical practice and the pension fund from the amount available for distribution.

**12.** We note, however, that the award is for more than one-half of the Quads IRA account, which was worth $137,241 at the time of trial. Appellant's two IRAs and his pension plan together totalled $161,281.

Appellant also argues that the trial court should have discounted the value of the accounts receivable by the amount of income taxes that Dr. Skrabak would have to pay when he collected them. Potential income taxes do not alter the value of an asset for purposes of determining the value of marital property. *Rosenberg v. Rosenberg,* 64 Md.App. 487, 523, 497 A.2d 485, *cert. denied,* 305 Md. 107, 501 A.2d 845 (1985). Tax consequences should be considered, however, as an "other factor" pursuant to FL § 8–205(b)(11). *See, e.g., Williams v. Williams,* 71 Md.App. 22, 37, 523 A.2d 1025 (1987). On remand, the trial court must take into account the amount of income tax that Dr. Skrabak will have to pay on the accounts receivable if they are not too speculative. *See Rosenberg, supra,* 64 Md.App. at 525, 497 A.2d 485.

Finally, appellant argues that the trial judge used "his power to enter a monetary award as a means of *punishing* " Dr. Skrabak. The trial court stated in its Memorandum Opinion that it had the right and the obligation under FL § 8–205(b)(11) to consider "other factors that are necessary or appropriate to consider in order to arrive at a fair and equitable award. In that regard, the Court will also consider that the defendant testified inconsistently." The trial court then pointed out a number of such inconsistencies between Dr. Skrabak's deposition testimony and his trial testimony. The court also stated that it was considering the fact that Dr. Skrabak "acted in ways that were in an apparent attempt to hide income and potentially defraud his wife." Finally, the court noted that Dr. Skrabak had attempted to obtain a fake identification for his 19–year–old girlfriend so that she could enter a nightclub with him.

"Circumstances not reasonably related to the joint enterprise of the marital unit or expressly included as factors, are not ordinarily relevant and should not be considered when fashioning a fair and equitable monetary adjustment." *Dobbyn v. Dobbyn,* 57 Md.App. 662, 681, 471 A.2d 1068 (1984). It would appear, at least on this record, that some of the factors considered by the trial court cannot fairly be characterized as "reasonably related to the joint enterprise of the marital unit."

We need not settle this issue, however, because the monetary award will be reversed on other grounds. Suffice it to say that on remand we shall assume that the trial judge will apply the law correctly to the case before him. *Major v. First Virginia Bank*, 97 Md.App. 520, 542, 631 A.2d 127 (1993).

## V. Did the trial court err by awarding post-judgment interest on amounts of the property settlement that were not presently due and payable?

Appellant contends that the trial court erred by ordering him to pay interest on the $160,000 of the monetary award that he was to pay in installments over eight years. Interest can only accrue against that part of a monetary award that is reduced to judgment. *Ross v. Ross*, 90 Md.App. 176, 190, 600 A.2d 891, *vacated on other grounds*, 327 Md. 101, 607 A.2d 933 (1992). The court may only reduce to judgment a monetary award that is "due and owing." FL § 8–205(c). Future installments are not currently due and owing. *Ross, supra*, 90 Md.App. at 190, 600 A.2d 891. We shall, therefore, remand and instruct the trial court to delete the award of interest on the amount not currently due and owing.

## VI. Should the trial court's alimony award be vacated?

Because of the relationship between a monetary award and alimony, we shall vacate the alimony award and remand the case so that the trial court may, exercising its sound discretion, redetermine the amount of alimony. *See, e.g., McAlear v. McAlear*, 298 Md. 320, 347, 469 A.2d 1256 (1984); *Deering v. Deering*, 292 Md. 115, 131, 437 A.2d 883 (1981).

**MONETARY AND ALIMONY AWARDS VACATED; JUDGMENT OF ABSOLUTE DIVORCE AFFIRMED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**